```
 1                  UNITED STATES DISTRICT COURT

 2                  FOR THE DISTRICT OF DELAWARE

 3

 4      COMCAST IP HOLDINGS I, LLC,  :   CA NO. 12-205-RGA

 5                                   :

 6                 Plaintiff,        :

 7                                   :

 8           v.                      :   May 4, 2015

 9                                   :

10      SPRINT COMMUNICATIONS        :

11      COMPANY L.P., SPRINT         :

12      SPECTRUM L.P., and NEXTEL    :

13      OPERATIONS, INC.,            :

14                                   :

15                 Defendants.       :   2:03 o'clock p.m.

16      ...........................

17

18

19                  TRANSCRIPT OF POST-TRIAL MOTIONS

20             BEFORE THE HONORABLE RICHARD G. ANDREWS

21                  UNITED STATES DISTRICT JUDGE

22

23

24

25
```

```
 1    APPEARANCES:

 2

 3    For Plaintiff:      CONNOLLY GALLAGHER LLP

 4                        BY:  ARTHUR G. CONNOLLY, III, ESQ

 5                                   -and-

 6                        DAVIS POLK & WARDELL LLP

 7                        BY:  MATTHEW B. LEHR, ESQ

 8                        BY:  ANTHONY I. FENWICK, ESQ

 9

10    Also present:       DAVID MARCUS, ESQ.

11                        General Counsel for Comcast

12

13    For Defendants:     MORRIS JAMES LLP

14                        BY:  RICHARD K. HERRMANN, ESQ

15                                   -and-

16                        MCGUIRE WOODS LLP

17                        BY:  BRIAN C. RIOPELLE, ESQ

18                        BY:  DAVID E. FINKELSON, ESQ

19                        BY:  RACHELLE H. THOMPSON, ESQ

20

21

22

23

24

25    Court Reporter:         LEONARD A. DIBBS
```

```
 1                    Official Court Reporter

 2

 3                 P R O C E E D I N G S

 4

 5          (The proceedings commenced at 2:03 o'clock p.m. as

 6    follows:)

 7              THE COURT:  All right.

 8              Please be seated.  Good afternoon.

 9              This is Comcast v. Sprint, No. 12-205, Post-Trial

10    Motions.  There's a motion by both the plaintiff and the

11    defendant.

12              Have you given any thought as to how you want to

13    approach these?

14              MR. LEHR:  I sort of presume Mr. Riopelle would go

15    first, your Honor.

16              MR. RIOPELLE:  We've not discussed it.

17              The way I see it, there's about five issues that we

18    need to discuss.

19              The JMOL in the '008, the JMOL in parsing, the JMOL on

20    damages, then the prejudgment interest and ongoing royalties.

21              Unless you have a preference, I would go in that order.

22              THE COURT:  Okay.  That's fine by me.

23              Fine by you?

24              MR. LEHR:  Fine, your Honor.

25              THE COURT:  All right.
```

1          Go ahead, Mr. Riopelle.

2          So, presumably, you're going to address the first three

3    now, then he'll address -- how would you like to handle it?

4          MR. RIOPELLE:  Is it easier for you --

5          THE COURT:  In a way it would work better for me if you

6    would address your motion, he could respond to it, then he can

7    address his motions.

8          And that way, he should go first on his, right?

9          MR. RIOPELLE:  I agree with that.

10         Would it make more sense to you if we address the '008

11   first, and then they can respond, if that was in your mind.

12         And then we could address parsing, and then he could

13   respond to that, and then we could address the damages, and he

14   could respond to that.

15         THE COURT:  Mr. Lehr, do you have a preference?

16         MR. LEHR:  That's perfectly fine, your Honor.

17         THE COURT:  Okay.  That's fine.  That will work all

18   right.

19         MR. RIOPELLE:  Mr. Finkelson will handle the '008 and

20   Ms. Thompson is going to handle the parsing.

21         THE COURT:  Okay.

22         By the way, let's put on the record who's here.

23         Mr. Connolly, and, Mr. Herrmann, who's here?

24         MR. CONNOLLY:  Good afternoon, your Honor.

25         Mr. Lehr, and his colleague, Anthony Fenwick, from

```
1    Davis Polk, and David Marcus, In-house Counsel for Comcast is

2    here as well.

3              THE COURT:  All right.  Thank you, Mr. Connolly.

4              Mr. Herrmann.

5              MR. HERRMANN:  Good afternoon, your Honor.

6              We have Mr. Finkelson, Brian Riopelle, and Ms. Thompson

7    from McGuire Woods.

8              THE COURT:  Good afternoon to you all.

9              Okay.  Mr. Riopelle.

10             (Pause)

11             Mr. Finkelson.  Sorry, I can't follow directions very

12   well.

13             MR. FINKELSON:  No problem, your Honor.

14             Good to see you again.

15             I'm going to address, your Honor, the '008 issues.

16             Ms. Thompson will address the other liability issues

17   related to parsing.

18             Just so we have it in front of us, your Honor, I'm just

19   going to put a slide on the Elmo in an attempt to have the

20   claims, the reasserted claims at issue in the '008 patent.

21             We have three claims at issue.

22             Claim 1, Claim 13, and Claim 27 of the '008 patent.

23   And each of those claims, each of the asserted claims, requires

24   four things.

25             The initiation of a call, one.
```

1          Two, from a calling party, or a first party, which

2   everybody agrees is me on my phone initiating a phone call to a

3   call destination or a second party, in which that call

4   destination or second party is determined as a result of domain

5   name signaling.

6          So call, calling party, call destination, and

7   determined as a result of domain name signaling.

8          Other than the calling party, the first party issue on

9   which we all agreed, the other were points of contention in the

10  trial.  And the jury was charged with applying, pursuant to your

11  Honor's instructions, the common meaning of these claim

12  requirements.

13         And instead of doing that, and it's Comcast's

14  indication during trial, the jury applied these clam terms in a

15  way that reads them out of the '008 patent all together.  That

16  renders them superfluous.

17         And in doing so by saying, one, that the claimed call

18  destination is anywhere the call is routed to.  That was the

19  theory of call destination that evolved during the trial.

20         We heard it in Mr. Lehr's closing.  We had never heard

21  it before trial, but we heard it there.

22         The claim definition is anywhere the call is routed to.

23         And, similarly, the claim identified the second party,

24  Comcast's expert testified isn't any --

25         THE COURT:  And just to interrupt you for a second, but

1    this is all your actual legal theory here is, there's

2    insufficient evidence to support the verdict, right?

3            MR. FINKELSON:  It's both.  That the verdict is legally

4    unsupportable and that there's insufficient evidence to support

5    it.

6            Similarly, I think your Honor made better points.

7            I was reading the L3 case, not involving

8    non-infringement, but involving invalidity, where your Honor

9    claimed the JMOL and noting the legal unsupportability, and not

10   enough evidence from which a reasonable jury could conclude.

11           THE COURT:  What case?

12           MR. FINKELSON:  It was the L3 Communications case.

13           THE COURT:  Oh, L-3.  I'm sorry, I thought you said

14   Alfree.

15           Okay.  L-3.  Yes, right.

16           Go ahead.

17           MR. FINKELSON:  So there's both issues, because what we

18   have here are claim terms, and our core argument is the jury was

19   charged with applying those claims terms according to their

20   common meaning, applied them in a way -- and, again, Comcast

21   indicates that they read them out of the patent all together --

22   and you can't do that, as a matter of law.  The jury cannot

23   apply the claim terms that renders them --

24           THE COURT:  Well, but that one -- see, that's the

25   reason why I asked this.

1              I mean, I think because you're, I believe, there's no

2      objection to any of the jury instructions I gave, so the

3      question is, under the law, what was the jury thinking?

4              But under plain and ordinary meaning of these various

5      terms, was there evidence from which the jury could reach the

6      verdict it reached?

7              MR. FINKELSON:  That's correct, your Honor.

8              And part and parcel of that is, they can't adopt a

9      theory of the claim terms that render the terms meaningless.

10     They stripped them out of the claims all together.

11             And those two, I think, come together, but I do think

12     they are different.  Just because a jury -- and your Honor is

13     correct -- there was not an objection to the jury being charged

14     to apply the common meaning of these terms, they were

15     unconstrued terms.

16             But there is no legal principle that says, just because

17     it's submitted as common meaning, as opposed to a construed

18     term, that the jury can just do whatever it wants.

19             THE COURT:  But, in other words, what you're really

20     saying is, here's -- I mean, maybe you're saying, Judge, you're

21     as good as anyone figuring out what the common meaning of these

22     things is.  And under the plain and ordinary meaning, there was

23     insufficient evidence, because there was no evidence of a

24     destination, or there was no evidence of the domain name system

25     signaling it did something.

1          Meaning, in a way, I guess what I'm saying is, either

2     I'm not understanding your argument, or you're confusing it

3     unnecessarily.

4          I mean, I think what you're saying really is kind of,

5     they led the jury in the wrong direction, so that kind of helps

6     our case, because there was insufficient evidence because they

7     -- I mean, that seems to me like what you're saying.

8          MR. FINKELSON:  Well, I think there are two separate

9     principles, but I agree with your Honor that they dovetail.

10          The jury is charged with determining infringement.

11     That's the jury obligation and they need to do so applying the

12     constructions given to them by the Court.  And for an

13     unconstrued term, your Honor instructed them to apply the common

14     meaning, so they are charged with doing that.

15          And on JMOL, the question is, could a reasonable jury

16     have adopted Comcast's infringement theory as applied to the

17     accused products.  They have read these claim terms in a way

18     that Comcast proposed to the jury at trial, without doing

19     violence to the claim language in such a way that the claims

20     become meaningless.

21          And that's what happened here.  It's not just, did they

22     check the box, but what was Comcast theory?

23          And if the jury adopted that theory, what is the result

24     of it for purposes of the claims, and does that go too far?

25          THE COURT:  Well, I mean, that's interesting.

1           You mentioned, did they check the boxes, because I

2    would have said, generally, that if they checked the boxes, and

3    understanding that check the boxes means offers some evidence on

4    the points in dispute, then, if they checked each of the boxes,

5    unless there was something wrong with the boxes, then there's

6    nothing to support of the verdict.

7           MR. FINKELSON:  I think our position, your Honor is,

8    there's something wrong with the boxes, one.

9           And, two, that merely checking them, even if they're

10   not, merely having their expert say, this limitation is met,

11   this limitation is met, this limitation is met without having

12   any underlying rationale -- I think we cited the Dynacore case

13   -- and there's other that say that alone is not enough.

14          And experts have --

15          THE COURT:  Well, he had an underlying rationale.  You

16   just don't agree with it.

17          MR. FINKELSON:  The result of that -- and I think what

18   makes this case extraordinary -- because we are here on a JMOL,

19   and we're very cognizant of the depth of juris prudence, and

20   this Court's granting of JMOLs of non-infringement, it's not

21   something that happens frequently -- what makes this case

22   extraordinary is that their theory, if adopted, which we have to

23   assume the jury did, took these terms and stripped them out of

24   the claims.  They read call destination as meaning anyplace

25   along the way in the route of a call.

1        They read identifier of the second party similarly as

2    anything that happens along the way to identifying --

3        THE COURT:  So, I mean, I hate to ask this, but what is

4    the plain and ordinary meaning of call destination?

5        MR. FINKELSON:  Your Honor, we think the plain and

6    ordinary meaning of call destination is the designation of a

7    call.

8        We heard a lot of evidence in this trial as to what a

9    call was.  I don't think there was any dispute at trial as to

10    what a call was.  A call is me picking up my phone and saying,

11    your Honor, I'm here.

12        And you saying, you know, Counsel, what do you want?

13        That's a call.

14        And there was no evidence presented by Comcast at trial

15    of the state of the art.  There is a notion of kind of mini

16    calls as part of a call.  There was no argument or presentation

17    of evidence that half the call to one place constitutes a call.

18        I mean, a call is a call, and a call destination can't

19    be divorced from the requirement that it be the destination of a

20    call.

21        And I think that's where the evidence got turned around

22    in this trial.  And, as I mentioned, it happened to our

23    surprise, because we hadn't heard it before trial.  Going into

24    trial, Comcast always disagreed with us that call destination

25    was the phone on the receiving end.

1          But Comcast had never taken the position that anything

2     is a call destination, because then the term wouldn't mean

3     anything.  They took the position that the call destination was

4     the last point in Sprint's network where the call went.

5          But when we got to trial, and the only witness who

6     could speak to how Sprint systems works said that's not how it

7     works.  When it hits the SBC or MGC in Sprint's network, it

8     doesn't go to some other network, it goes back into Sprint's

9     CDMA network.

10         So the factual presentation was such that we saw an

11    about face by Comcast.  And all of a sudden the testimony at

12    trial was, it's every point along the way.  And that just goes

13    too far.

14         You asked the question, what's fair, and what do we

15    think it is?

16         But ultimately the question on JMOL is for the jury to

17    have reasonably adopted a view that it was anyplace along the

18    way.

19         And what happens to this claim, when you adopt that

20    view is, call destination --

21         THE COURT:  Well, that's why I don't know that I

22    necessarily agree with you that that's even what the issue is.

23         All that really -- the issue is whatever it was that

24    Sprint -- I'm sorry -- you're Sprint -- whatever it was that

25    Comcast pointed to as being the call destination, could that

1    have been a call destination?

2         It is not like every point along the way, yes, sure,

3    maybe Mr. Lehr said that wrong in the argument, but from the

4    sufficiency of the evidence, we're not interested so much in his

5    theory, as whether whatever the particular evidence that there

6    was at the trial is sufficient to meet claims, right?

7         MR. FINKELSON:  I think that's correct.  It wasn't just

8    from Mr. Lehr's argument.  We heard from their expert.  And

9    that's the evidence on which they rely was Dr. Burger's

10   testimony that it is, in fact, anywhere the call is routed to.

11        And, so, we have to look at that and say, could a jury

12   reasonably have concluded that this claim is met by virtue of a

13   call being started on Sprint's network being made to this thing

14   called the SBC, or MGC, or Airave?

15        Could the jury have reasonably concluded that that's,

16   A, a call, and, B, that that midpoint is a call destination.

17        And other than Dr. Burger saying so, there was no

18   evidence whatsoever to support that.  The only evidence about

19   what a call is, is what I described to your Honor.  There was no

20   evidence to the contrary.

21        The concept of a destination, in and of itself, means

22   an end point.  It means something and it's not just the end

23   point of anything.  It's the end point of a call.

24        And, again, if a destination can be anything, which it

25   literally can under the theory put to this jury by Comcast, then

1    it doesn't mean anything.  And then all we have in this claim is

2    a call over a switched telecommunications network using DNS.

3    That's all that's left.

4              And that's not what this claim says, your Honor.

5              The case law says that Comcast and the jury can't do

6    that.  We've cite the Smith & Nephew case from the Federal

7    Circuit saying, you cannot adopted a theory of infringement

8    that's inconsistent with the claim language of the patent.

9              We cited the Aguayo case from the Southern District of

10   Texas, which involved -- it's a long opinion, it's like 152

11   footnotes, but when you dig into it, it involved both construed

12   and unconstrued terms, terms on which the jury was charged with

13   applying ordinary meaning.

14             And there the Court granting JMOL of non-infringement

15   said, the jury verdict goes too far, because it conflates these

16   claims terms in a way that, essentially, strips one out of the

17   patent.

18             And we have a very similar thing going on here.

19   There's a point at which you can't go -- I mean, it has to -- a

20   common meaning or a construed term, the jury still needs to

21   apply the claims of the patent to the accused products in a

22   reasonable way to reach an infringement verdict.

23             And by adopting this theory of call destination, we

24   would submit, your Honor, that it's a fatal approach.  It

25   doesn't -- it doesn't meet the tests for doing that.

1          THE COURT:  All right.

2          So, besides call destination, is there anything else in

3     particular you want bring up in relation to this patent?

4          MR. FINKELSON:  If I can say a couple of other things,

5     and this is tied into call destination, but it's also the

6     identifier of a second party, and it's in our briefing.

7          And that is, the other thing that kind of makes this

8     verdict unsupportable, when it comes to call destination, and

9     also when it comes to identifier of a second party, is this

10    conflicting evidence that we have from Dr. Burger, himself, as

11    to what is infringing and what isn't infringing.

12         THE COURT:  Conflicting evidence from Dr. Burger,

13    himself, that goes to the weight of the evidence, doesn't it?

14         MR. FINKELSON:  I don't think it goes to the weight of

15    the evidence, your Honor.

16         It goes to whether a reasonable jury, listening to Dr.

17    Burger's testimony, and understanding the theory of

18    infringement, could have reached the conclusions that it did.

19         And this concept is captured on the verdict form,

20    itself, which I put up on the screen.

21         Recall, or likely not, let me remind you --

22         THE COURT:  You got that right.

23         MR. FINKELSON:  I'm one for whatever at least.

24         But the jury found in the verdict form infringement by

25    Sprint when an SMI subscriber on a Sprint CDMA mobile handset

1    makes a call to any party except for a Sprint subscriber that is

2    not an SMI or Google Voice user.

3         In other words, Sprint infringes the '008, when SMI or

4    Google Voice call anyone except a regular Sprint subscriber.

5         That was what the jury verdict form said.

6         THE COURT:  And your argument here is that you can't

7    figure out how these Sprint subscriber exceptions make any

8    sense?

9         MR. FINKELSON:  It doesn't make any sense.  It is

10   wholly inconsistent and cannot be reconciled with the conclusion

11   of infringement with respect to everything, but the except

12   clause, because this comes straight out of Dr. Burger's report,

13   and straight out of the Dr. Burger's trial testimony.  Where he

14   testified at trial that calls to a regular Sprint subscriber

15   don't infringe.

16        Because why?

17        Because the MGC and the SBC are not the final point of

18   those calls in Sprint's network, and are, therefore, not call

19   destinations.  Again, your Honor, a remanent of the original

20   theory of infringement that we had heard coming into trial.

21        But the only evidence of record, your Honor, with

22   respect to the accused call flows, and the ones that Dr. Burger

23   said are non-infringement, was Mr. Nehme's testimony, and he

24   said they functioned in exactly the same way.

25        In other words, just as in the call flow that Dr.

1    Burger said is non-infringing, in the accused call flows, the

2    SBC and the MGC aren't the last point in the network.  They go

3    back to the Sprint CDMA network in exactly the same manner.

4         There's not one shred of evidence anywhere in the trial

5    record that they function differently.

6         Yet, Dr. Burger, I think in the most pertinent part of

7    his testimony I put up on the screen.  It's trial transcript 677

8    and then 680.

9         Dr. Burger, I asked him.

10        And your infringement opinions in this case are based

11   on your assumption of the SBC and the MGC, or the SBC, or the

12   MGC are the final points in Sprint's network to which a call is

13   routed in the accused call flow is correct?

14        "That's correct.

15        "You agree that a call from an SMI caller to a regular

16   Sprint subscriber does not infringe the '008 patent, because

17   after routing to MGC it continues on to another point in the

18   Sprint's network for further routing; is that correct?

19        "That's correct."

20        Now, we saw in Comcast's briefing he really didn't

21   testify to that first.

22        He said, well, I don't know if I offered an opinion.

23        He offered an opinion on these call flows.  There are a

24   ton of call flows that they didn't accuse of infringement.

25        There's only one call flow that shows up with an except

1      clause on the verdict form and it's this one.

2              His theory of infringement, or non-infringement, with

3      respect to these call flows, applies 100 percent with equal

4      force based on the record evidence to the accused call flows,

5      because Mr. Nehme -- and this is on Page 485 and then 490 of the

6      trial transcript, he testified they worked the same way.   In

7      every instance that's how the call flows.

8              So, the jury could not possibly have reconciled those

9      two competing views, that in a call flow that works exactly the

10     same way in one SBC as a destination, or an MGC as a

11     destination, and in the other it's not.   There's no way to

12     reconcile those points.

13             THE COURT:  But did the jury have to reconcile it?

14             MR. FINKELSON:  I think they did in order to adopt Dr.

15     Burger's view of what the call destination is.

16             It has to find something, right?

17             So they were asked to find that the SBC and the MGC are

18     call destinations.  They were asked to find those.

19             Yet, they were presented with evidence reflected in the

20     verdict form that Comcast's own expert said the same calls are

21     non-infringing when they follow the exact same path.

22             THE COURT:  Well, I mean, the verdict form reflected

23     that, because that was not an accused product, or accused

24     method, right?

25             MR. FINKELSON:  The verdict form reflected that with a

1    slight adjustment.  It reflected that because Comcast's expert

2    affirmatively carved it out of his infringement opinions.

3         THE COURT:  Right.  And, so, somewhere along the line

4    it got dropped as an accused product, right?

5         MR. FINKELSON:  That's correct.  He found it was

6    non-infringing.

7         THE COURT:  So, let's assume that Comcast did have

8    malleable claim construction or infringement theories.  Once

9    they dropped it out of the product, they couldn't very well have

10   walked it back in, could they?

11        I hesitate to answer what Comcast might have been able

12   to do, given what I saw live at trial, but Comcast had carved it

13   out of its infringement case by saying it does not infringe.

14   And they carved it out specifically on a theory that when a call

15   flows in particular way, it doesn't infringe.  And then all of

16   the evidence at trial, as to the accused call flows is they

17   flowed in the exact same way.

18        THE COURT:  So, I mean, I guess in a way -- and maybe

19   there's a reason why you argued the second -- but I don't think

20   this is your best argument.

21        So what you're saying is that Dr. Burger's testimony

22   was inconsistent.  You had a chance to cross-examine him.

23   Apparently, whatever the cross-examination wax, it didn't

24   convince the jury that he was not making a point when he

25   supported his infringement theory.

1           And, so, that seems to me to be something that really

2    is, you know, the jury could have gone either way, but whichever

3    way they go, there's evidence to support it.

4           Do you have anything else on the '008?

5           MR. FINKELSON:  The only thing I would mention is with

6    respect to Claim 27, your Honor, because it does have the

7    different language, it has the identifier of a second party, and

8    second party language.

9           I think our argument follows much the same path.  There

10   is there are different facts behind it, because we're dealing

11   with different claim language and a different claim -- a

12   different theory of infringement from Comcast.

13          But, essentially, our position, your Honor, is that

14   without gutting the claim entirely, the jury could not possibly

15   have chosen to believe Comcast's infringement theory for the

16   identifier of the second party requirement.

17          Comcast's theory requires a couple of things on this

18   claim.

19          One, it requires finding that the second party that's

20   being called by the first party, in other words, me picking up

21   my phone, is not, in fact, a party to a call at all, but is a

22   service provider like Verizon.  That's their theory of

23   infringement.  The second party is Verizon.

24          What is the evidence of that?

25          Dr. Burger saying, Verizon is the second party.  This

1    element is met.  That's it.  There's no facts behind that.

2    There's no evidence behind that whatsoever.

3            And even if the jury accepts that the second party to

4    the call, my call to you, the second party to that call is

5    Verizon, the jury could not possibly, without rewriting the

6    claim, have concluded that the address of this MGC out there

7    identifies the second party.  In other words, identifies

8    Verizon.

9            The only evidence of record in the trial with respect

10   to that is Mr. Nehme's testimony that the MGC and SBC are not

11   specific to any service provider.  That's the only evidence.

12           And on the other side, again, we have Dr. Burger

13   reading the limitations of the claim and saying it's met.  And,

14   again, the law says that's not sufficient.

15           Similarly, and lastly, in the area of two flow, we

16   would submit, your Honor, that a jury could not reasonably find

17   that identifying a piece of equipment just anywhere in the

18   middle of the call flow, like the conversion server, which is

19   what Dr. Burger pointed it to, qualifies as identifying the

20   second party to the call.

21           So, in the area of two call flow, I think Comcast's

22   theory at trial was that the call destination was the area of

23   the two device, and that the calling party or the second party

24   was the person receiving the call on the other end of the A-2

25   device.

1          Even if you accept the notion that the second party is

2     the A-2 device, all of the evidence at trial was that the only

3     time that DNS was used was way back during the call flow to

4     determine the address of this thing called the conversion

5     server.

6          And Mr. Nehme testified again, unrebutted, there is not

7     ounce of DNS that is used in any way to identify the second

8     party to the call.  And in no way is the second party to the

9     call, or the call destination determined as a result of domain

10    name signaling.

11         THE COURT:  All right.  Thank you.

12         I guess I'll hear what Mr. Lehr has to say.

13         MR. FINKELSON:  Thank you, your Honor.

14         MR. LEHR:  I'm going to leave this up, your Honor.

15         First of all, good afternoon, your Honor, it's good to

16    be back.

17         Your Honor has already anticipated most of the points

18    that I was going to make, so I'm not going to make them again.

19         The real issue here on call destination is, my friend,

20    Mr. Finkelson, made a fine Markman argument this afternoon.

21         This isn't about Markman anymore.  There was ample

22    evidence in the record that a call destination -- that's one of

23    the reasons I want to put this back up -- if you look at, just

24    by way of example Claim 1, it refers to a call destination which

25    we all know means that there be can be multiple call

1    destinations.  That's No. 1.

2         The fight here is that it has to be the phone on the

3    other end.  It couldn't be something that uses the internet

4    signaling that is a destination that is determined, based on

5    that DNS signaling along the way, an MGC, SBC, a MAC address of

6    an A-2.  And there was ample evidence in the records about that.

7    Ample evidence.

8         And, so, the fight began, is it only exclusively the

9    call phone, or can it been devices along the way that are

10   determined using DNS signaling?

11        There's ample evidence in the record on that.

12        The more curious point, I think, your Honor, if you

13   look at their reply brief, for the first time we see an argument

14   where they highlight the word "between" -- "between a calling

15   party," et cetera, et cetera.

16        They bold that in the reply brief three times.

17        The first time we ever heard that argument was in the

18   reply brief.  Dr. Mercer didn't testify about it at trial.

19   There was no opinion offered that that word "between" meant some

20   particular thing.

21        So, really, it just comes down to can a call

22   destination be a MGC, for example, remembering that the jury was

23   supposed to consider this ordinary meaning as somebody skilled

24   in the art?

25        We referred to servers in our patents as destinations.

1    They referred to it in their own documents to points along the

2    way.

3         THE COURT:  Their documents refer to destinations,

4    right, as opposed to call destinations?

5         MR. LEHR:  Yes, but the point, your Honor, is in a

6    network system, where you've got an IP address that's sending

7    this stuff everywhere, there's an IP destination.  That's the

8    destination of where it's going to.

9         The jury was presented with specific evidence that

10   that's how people skilled in the art would think about this, and

11   there was ample evidence to support that.

12        I would also note, your Honor, if we're going to talk

13   outside the trial record, in the ex-parte reexaminations that

14   Sprint filed against these patents in the Patent Office, the art

15   that they cited, they identified servers as call destinations.

16        Everybody understands -- and we didn't fight that in

17   the Patent Office -- everybody understands that destinations in

18   the context of this technology are, as Dr. Burger testified,

19   routed to destinations.

20        The other point that your Honor already picked up on --

21   and I don't feel like I need to say it again, Mr. Finkelson is a

22   fine cross-examiner, and he did a very fine job on Dr. Burger at

23   trial, and he highlighted some inconsistencies in Dr. Burger's

24   testimony, as we all do in every single case with every expert

25   witness -- not as easily as Mr. Finkelson did -- but we all

1    tried our best.  JMOLs alone are not granted because there's

2    some inconsistent testimony in the record.

3           The question is, is there substantial evidence that a

4    jury can rely on the question of call destinations?

5           Unequivocally, yes.

6           The very final point I'll make, your Honor, and this

7    kind dovetails a little bit about the notion of this "between"

8    thing that is pointed out by Sprint in their reply brief.

9           Mr. Finkelson did not refer to Dr. Mercer much in his

10   argument today and I certainly understand why.

11          THE COURT:  Well, in terms of the nature of the

12   argument that he's making, just because Dr. Mercer said

13   something different, you know, that's kind of immaterial,

14   because we assume the jury accepted Dr. Burger, and rejected Dr.

15   Mercer, so if that's all you've got, then you've got nothing.

16          MR. LEHR:  I don't disagree with that, your Honor.

17          But my point was going to be on this notion of it being

18   a completed call, that the call destination being this phone at

19   the other end.

20          Dr. Mercer testified, unequivocally, that the claims at

21   issue in the '008 patent do not require a completed call.  It's

22   at Page 974 of the transcript.

23          So, the way these claims are written, the way they're

24   set up, if you look at Claim 1, it's initiating --

25          THE COURT:  I'm sorry.  Dr. Mercer said you do not

1     require a completed call.

2             In what context was that?

3             MR. LEHR:  I was asking him, specifically, these --

4     Claim 1, for example, talks about initiating a call.

5             So the call is initiated.  DNS signaling is used.  It

6     basically finds a call destination.  That's the heart of the

7     claim.

8             And I basically asked him, because his theory at trial

9     was it has to be a phone, or there has to be two people talking.

10    That's why they highlighted this word "between."  There had to

11    be two people talking.

12            Whereas, Dr. Mercer, again on Page 974 of the

13    transcript, these claims don't require a completed call.  And he

14    conceded that.  They don't require a completed call.

15            So that's really all I had.  I think your Honor picked

16    up on really the key points.  Where there's conflicting

17    testimony, but there is testimony, the jury is free to accept

18    whichever.

19            THE COURT:  And just to make sure that I've got it

20    clear.

21            Your position is, basically, that if the trial record

22    -- that the jury could decide that the call destination

23    requirement was met by any number of different destinations

24    along the way?

25            MR. LEHR:  Well, so, yes is the answer to the question,

1    your Honor, but I want to be a little more specific.

2         And this is where I confess I don't fully appreciate

3    Sprint's argument when they say, you adopt what we say.  You're

4    reading this thing entirely out of the claim.

5         There are, as we all know, there are many, many

6    destinations, and routes, and things that transpire in one of

7    these call flows.

8         It's only the call flows -- it's only the portion of

9    the call flow that utilizes DNS signaling or ENUM that

10   identifies the destination from there on, okay?

11        So it's not -- I mean, I confess maybe I was a little

12   unclear in my closing, but the point I was trying to make is, to

13   the extent that something uses DNS signaling to identify an

14   address, that satisfies the claim.

15        And that's really -- and there was abundant evidence in

16   the record for that.

17        In fact, your Honor, when I asked Mr. Nehme on recross

18   at the end I said, "You will agree with me that in every single

19   call flow there is either a successful DNS query or a successful

20   DNS signaling?

21        "Answer:  Yes."

22        And that's really what these all go to.

23        I don't have anything further, unless your Honor has

24   any questions.

25        THE COURT:  Stand there for a second and let me think.

1          Don't take the claims down.

2          MR. LEHR:  You caught me, Judge.  All right.

3          (Pause)

4          THE COURT:  All right.

5          I don't have any more questions.

6          MR. LEHR:  Thank you, your Honor.

7          MR. FINKELSON:  Very briefly, your Honor, on that

8    point?

9          THE COURT:  Sure, Mr. Finkelson.

10         MR. FINKELSON:  I don't think I misheard Mr. Lehr, but

11   as I heard what he said, it is exactly what I said, which is, if

12   you use DNS signaling in any portion of the call, essentially,

13   that portion of the call becomes a call, and the end point of

14   that portion becomes the destination.

15         THE COURT:  Yes, that seems to me like what he said.

16         MR. FINKELSON:  And the claims doesn't support that and

17   the evidence doesn't support that.

18         THE COURT:  The evidence does support that, doesn't it?

19         MR. FINKELSON:  The evidence doesn't support -- well,

20   you cannot interpret these claims by their common meaning, these

21   claims terms.

22         THE COURT:  I guess my point is, if Mr. Lehr correct as

23   to what call destination is, or could be, and then there's

24   plenty of evidence, as he says, to support that theory, right?

25         MR. FINKELSON:  So I think the theory is wrong, and I

1    think your Honor --

2            THE COURT:  No, no, no, I mean the theory was wrong.

3            MR. FINKELSON:  -- understanding of the theory on that

4    is wrong.

5            Let's say the theory is exactly as he described it.  I

6    mean, there is no evidence of record, other than Dr. Burger

7    saying, this box is checked, this box is checked, this box is

8    checked.  There's no evidence of record that says there is such

9    a thing as a call from a calling party to what they're calling

10   the call destination.

11           None.  The only evidence is that their own expert said,

12   you can't call it an SBC.

13           Mr. Nehme said, you can't call it an SBC and you can't

14   call it an A-2 device.

15           There' is no evidence of record.  If you are going

16   redefine a call --

17           THE COURT:  Isn't, I think, what Mr. Lehr saying is,

18   yeah, so when we make a call, if I want to speak to you, I'm

19   going to call your number, but that doesn't mean that you are

20   the only call destination.

21           His argument is, in the process of initiating that

22   call, there are some other destinations along the way.

23           And how is that not covered by the claim?

24           MR. FINKELSON:  Well, I think for starters, your Honor

25   construed setting up a call and initiating a call.  And I think

1    the transcript portion Mr. Lehr referred to was in the context

2    of Dr. Mercer addressing that, and it was setting up a bearer

3    channel between, actually between Phone A and Phone B.  That was

4    --

5            THE COURT:  Okay.  I forgotten that, but thank you.

6            MR. FINKELSON:  Your Honor's construction was setting

7    up a bearer channel through a switch telecommunications network.

8            The testimony of record at trial as to what that meant,

9    in the context of the patent, I think was undisputed.  It was

10    Figure 13 and it was supporting the spec language around it.

11            And it said, setting up a bearer channel between A and

12    B.  It's as bright as day in Figure 13 of the patent and the

13    spec describes it as such.

14            But, if anything, if you can pick what your call is

15    going to be, right?  And instead of a call in the common meaning

16    of the term, your call can be any subset of steps in a call,

17    then everything is a call destination.  All you've got to do is

18    change what you're saying the call is.

19            The call can be from the initiating party to Box 1, it

20    can from Box 1 to the SBC, it can be from Box 1 and your call

21    destination can be something up in the CDMA network.

22            If you take that argument to the extreme, which I keep

23    waiting for kind of where the locations come from.  I thought I

24    saw something in their brief to suggest that using DNS to denote

25    circuits or a bandwidth wouldn't qualify under the claims, but

1    I'm not sure that I fully understood that.

2           But there is no restriction on the theory that they've

3    presented to the jury.  This claim becomes a moving target, and

4    all it ultimately requires, if your Honor looks at this claim

5    and adopts that view of call destination, or looks at it through

6    the lens of that view of call destination, then you need a

7    switch telecommunications system, you need a call being

8    initiated.  As soon as that happens, you can redefine call any

9    way you want, and you're going to have whatever destination you

10   want.

11          So all of that language just becomes superfluous.  You

12   just have to have, somewhere along the way, a domain name

13   signaling.  As long as you have a switch telecommunications

14   network, a call being initiated, and domain name signaling, on

15   their theory that's all the claim requires.

16          You cannot -- the jury cannot reasonably read the claim

17   this way.  I don't care whether they are charged with a

18   construed term or a common meaning term.  You can't read the

19   claim in a way that strips it of two-thirds of its language.

20          The last thing I'll say is on this "a" point, because

21   its service began in the brief.  The notion that it said "a call

22   destination," and that means it can mean multiple call

23   destinations.

24          First of all, "a" is used because patent drafting

25   contentions require the first time you refer to something, you

1    call it "a."

2         It's, therefore, no surprise that when it talks about

3    it later in the claim, it uses "the," because patent drafting

4    contentions -- inventions mandate that you use "the" the second

5    time or else you've got an antecedent basis problem.

6         THE COURT:  Right.

7         MR. FINKELSON:  The other issue is, it's not -- again,

8    it's a call destination, a term that in and of itself denote an

9    end point.

10        And this is last point I'll make.

11        I watched the Kentucky Derby on Saturday while I was

12   preparing for this argument.  Maybe not a good combination.

13        But imagine a claim, your Honor, where you've got a

14   claim to a horse race, and it comprises a horse, a mint julep,

15   and a race winner.  They all say "a," right?

16        You could certainly argue that the claim permits more

17   than one horse, and more than one mint julep, but you can't

18   argue that just because "a" precedes race winner, that the race

19   winner can be the horse leading at the quarter mile post, or the

20   race winner can be the horse leading at the half mile post.  The

21   race winner, itself, demand an end point just like call

22   destination does.

23        Except in extraordinary circumstances, demand

24   singularity, just like call destination does, and that's our

25   point with respect to this term.

1        You just can't take this term and say, well, it doesn't

2    say final destination, it can be on my trip to Alaska, as Mr.

3    Lehr said in his closing.  It can be Chicago.  It can be the

4    ticket counter.  It can be a rafter and it can be my seat.  You

5    do that and the claim is stripped of all its meaning.

6        And I think the law is clear that JMOL standard, or no

7    JMOL standard, you cannot do that, and JMOL is appropriate in

8    those circumstance.

9        THE COURT:  All right.  Thank you.

10        All right.

11        Shall we go on the next one?  Is that you, Ms.

12    Thompson?

13        MS. THOMPSON:  Yes, your Honor.  Thank you.

14        Good afternoon, your Honor.

15        THE COURT:  Good afternoon.

16        MS. THOMPSON:  I will be addressing the parsing

17    limitations and the asserted claims of the '046 and '916

18    patents.

19        Your Honor has construed this term to mean an automated

20    process of analyzing the stream according to a set of rules of a

21    grammar.

22        There must be record evidence that Sprint's use of ENUM

23    satisfies every portion of the Court's claim construction.

24        But here the evidence, even when viewed in the light

25    most favorable to Comcast, failed to show that Sprint's use of

1    e-mail satisfied every aspect of the Court's construction, and,

2    therefore, it's legally insufficient.

3         Now, for the convenience of the Court, I will route

4    this evidence, purported evidence, into two buckets.

5         One for deterministic algorithms and the other for Dr.

6    Burger's testimony about the ENUM family.

7         As to the deterministic algorithm, this Court's

8    analysis is actually exemplified.  There is no evidence in the

9    record that Sprint useless a deterministic algorithm,

10   particularly where Dr. Burger conceded that he never looked at

11   the algorithm or source code that Sprint uses.

12        THE COURT:  So, first off -- and maybe I should know

13   the answer to this -- what is the difference between an

14   algorithm and an deterministic algorithm?

15        MS. THOMPSON:  Um --

16        THE COURT:  Because I know what an algorithm is, but

17   I'm not sure what is meant by a deterministic algorithm.

18        MS. THOMPSON:  And I think the record actually is

19   unclear as to what is meant by a deterministic algorithm, other

20   than Dr. Burger just making conclusory statements that an

21   algorithm was deterministic.

22        THE COURT:  Okay.  And, so, algorithm just basically

23   means a set of rules for doing something, right?

24        MS. THOMPSON:  Not necessarily so, your Honor.

25        In the context of what -- Comcast purports to be a

1    computerized invention, a computerized method, an algorithm in

2    that context will be the instruction or the program that the

3    computer would run to carry out the rules.

4         THE COURT:  And, so, with these phone numbers,

5    reversing order, sticking some dots in, and adding some

6    extensions at the end, why isn't that an algorithm?

7         MS. THOMPSON:  Because, your Honor, the record evidence

8    is evidence from the standard, which is just a set of rules from

9    the standard, or from a vendor manual, again, showing the

10   standard, but not the computer language.

11        The computer instructions, if you will --

12        THE COURT:  But if we know -- I guess what I'm having

13   trouble with is, I think, but tell me if I'm wrong -- it's

14   conceded that the Sprint rearranges number as we've stated,

15   right?

16        MS. THOMPSON:  What's in the record, your Honor, is

17   that Sprint does practice ENUM, that is correct.

18        THE COURT:  Okay.  And by practicing ENUM, does that

19   mean rearranging the numbers, putting some dots in, and adding

20   extensions?

21        MS. THOMPSON:  That is part of the definition, your

22   Honor, putting in dots, reversing the numbers, and adding what

23   they have called an arpa.

24        THE COURT:  Okay.  So, tell me why that's not an

25   algorithm?

1          MR. FINKELSON:  That is not a computer algorithm, your

2     Honor, because there is no evidence of a computer algorithm.

3     All there is, is a set --

4          THE COURT:  Well, I mean, do we think someone is

5     sitting around doing this by hand?  I mean, it happens --

6          MS. THOMPSON:  That's a very good point, your Honor.

7          Someone is purportedly sitting around doing this via a

8     computer.

9          Where is the computer language that actually executes

10    the algorithm?

11         If you do not even look at the computer algorithm,

12    then, in this instance, Dr. Burger cannot say for certain that

13    it is deterministic.  He hasn't looked at it.

14         What's in a vendor manual -- and, actually, Mr. Nehme

15    testified about this -- he told or testified at a high level,

16    but to be certain, he stated that one would need to look at what

17    the vendor does.

18         What does the vendor's algorithm look like?

19         The record evidence here is high level, because Dr.

20    Burger didn't see the need to look at an algorithm.  If he

21    doesn't look at -- and by "algorithm," I mean computer

22    algorithm, because it's their theory that this is a computerized

23    invention, your Honor --

24         THE COURT:  So, let me interrupt you for second for a

25    second.

1              Did Dr. Mercer look at the computer and offer an

2    opinion on this topic?

3              MS. THOMPSON:  I believe the record evidence is, no,

4    and that is because Dr. Mercer doesn't have the burden of --

5              THE COURT:  Well, no, no, I understand he doesn't, but

6    I was just wondering because -- I was just wondering.

7              MS. THOMPSON:  Yes, as were we for part of the case,

8    your Honor, but aside from that, there is no record evidence as

9    to what a Sprint algorithm looks like.

10             You only have record evidence of what the vendor

11   documentation looks like, and the rules of the vendor

12   documentation, and the standard.

13             So, for Dr. Burger to go from a vendor document, and

14   the standard, and then conclude that Sprint's algorithm that he

15   didn't even look at is, in fact, deterministic, is at best a

16   guess, your Honor.

17             THE COURT:  Okay.  And I think we've already agreed

18   that we don't even know what deterministic means?

19             MS. THOMPSON:  No record evidence of that, your Honor,

20   other than what's in the patent.

21             THE COURT:  Does the patent say something relevant to

22   --

23             MS. THOMPSON:  It defines what a deterministic

24   algorithm is, and it gives an example in Column 18 of the '046

25   patent.

1          THE COURT:  Go ahead.

2          MR. FINKELSON:  But what Dr. Burger, in that instance

3     was testifying about what's in the patent, and then just

4     concludes that Sprint's algorithm that he never looked at,

5     admittedly, was a deterministic algorithm.

6          So because that testimony is, in itself, speculative

7     and not based on fact, the Court should ignore that evidence and

8     it should not support a finding of infringement in this case.

9          THE COURT:  Just to make sure -- I think I got this --

10    but it all comes from the definitions of "parsing," so to speak?

11         MS. THOMPSON:  Yes, your Honor.

12         THE COURT:  Okay.

13         MS. THOMPSON:  It was Dr. Burger's theory that Sprint's

14    algorithm is deterministic, and, therefore, it's parsing.

15         Well, he didn't look at the algorithm for Sprint, so,

16    therefore, he could not conclude that Sprint's algorithm was, in

17    fact, deterministic.  He could only speculate, your Honor.

18         As to the second category --

19         THE COURT:  And, I'm sorry, when he was testifying

20    about this, was he cross-examined on how he could say such bold

21    things without looking at the computer algorithm?

22         MS. THOMPSON:  He did, your Honor, and he testified

23    that he didn't see the need to look at the computer algorithm.

24         THE COURT:  All right.

25         Okay.  You did say that.

1          MS. THOMPSON:  Yes.

2          THE COURT:  Good point.

3          MS. THOMPSON:  And he was ably cross-examined, your

4    Honor, as was noted earlier.

5          As to the second category of evidence, the evidence

6    that relates to Dr. Burger's testimony about the ENUM standards

7    expense.

8          So, the actual standard that Dr. Burger looked at, that

9    testimony, and that evidence is legally insufficient, because it

10   does not meet the Court's construction of parsing.

11         Now, Dr. Burger testified at trial that certain steps

12   in the ENUM standard -- and these are Steps 4, 5, and 6 were

13   parsing, but at the same time in this very trial, and during his

14   deposition, he testified that those same steps are not parsing.

15         And this, your Honor, comes up in the context of the

16   grammar aspect of your Honor's construction of parsing.  And I

17   refer you to the trial transcript at 579.

18         There, Dr. Burger testified, A grammar is just when you

19   have a set of tokens, or just a bit of streams, what's the

20   relationship between the token.

21         So Dr. Burger equated these relationships with grammar.

22         And what did Dr. Burger saying about those

23   relationships?

24         Dr. Burger testified that the relationship between them

25   is to put them in the opposite order, put dots in there and then

1    put the e164.arpa suffix.  And that is the sole evidence of the

2    grammar aspect of the Court's construction in the case.

3              But Dr. Burger admitted in this Court, and testified

4    during a deposition, that that step of putting them in opposite

5    order which corresponds to Step 5 of the ENUM standard, and

6    putting in dots which correspond to Step 4 of the ENUM standard,

7    which corresponds to Step 6 of the ENUM standard was not

8    parsing.

9              So Dr. Burger testified that something could be both A

10   and minus A at the same time in terms of logic.

11             While, in this case, something could both infringe and

12   not infringe, because it's both parsing and not parsing.

13             That is an irreconcilable conflict as well, your Honor,

14   no reasonable jury could hear Doctor -- and this was on

15   cross-examination where he testified -- that no reasonable jury

16   could reconcile that step being parsing, and at the same time

17   those very same steps not being parsing, as evidence of grammar

18   for the Court's construction.

19             No reasonable jury could find that parsing was

20   satisfied in this case based solely on Dr. Burger's testimony

21   about Steps 4, 5, and 6.

22             Now, Comcast would have the Court believe that, well,

23   Dr. Burger wasn't talking about the Steps 4, 5, and 6 together.

24   He was talking about it in isolation.

25             Well, that's not what he said here at trial.  He was

1    cross-examined.  He didn't clarify that at trial and the

2    statements speak for themselves.

3          4 is not parsing, Step 5 is not parsing, Step 6 is not

4    parsing.  Not only is it not parsing, Step 6 comes at the end,

5    after the other parsing has occurred.

6          No jury could hear Dr. Burger's testimony that 4, 5,

7    and 6 are parsing, and at the same time hear his testimony that

8    they are not parsing.

9          Again, they're an irreconcilable conflict.

10         THE COURT:  You're saying that Dr. Burger wasn't

11   incredible?

12         MS. THOMPSON:  Not a credibility determination.  This

13   is a matter of law.  Something can't both infringe and not

14   infringe at the same time.  Something can't be parsing and not

15   parsing at the same time.

16         THE COURT:  All right.

17         MS. THOMPSON:  There is tensions here.

18         THE COURT:  Well, there might be tension, but, of

19   course, tension -- you know, it's like tying it to the runner,

20   and tension goes to Comcast.

21         MS. THOMPSON:  In that instance, your Honor, I don't

22   think the tie goes to Comcast.

23         I think at least at the very minimum, the Court should

24   revisit the issue, because the only evidence of record of

25   parsing, based on the Court's grammar aspects of parsing, is

1    that something is both parsing and not parsing.

2              THE COURT:  All right.

3              MS. THOMPSON:  It's illogical and unfounded as a matter

4    of law.

5              THE COURT:  All right.

6              I think I more or less got your point there.

7              All right.

8              Thank you Ms. Thompson.

9              Mr. Lehr.

10             MR. LEHR:  Very briefly, your Honor, just a couple of

11   points.

12             A deterministic algorithm is an algorithm that does the

13   same thing over and over again.  By definitions that's what it

14   is.

15             THE COURT:  Okay.  And, I'm sorry, where are you

16   getting the definition from?

17             MR. LEHR:  Well, so, I'm taking it -- I'm not reading

18   it verbatim from the patent, but what the patent says is -- this

19   is the '046 at Column 19 -- it says, it is, therefore, possible

20   to parse telephone numbers using a deterministic algorithm for

21   taking, for example, four digits at a time to limit the size of

22   each sub-domain.

23             So what it's saying is you're doing the same thing over

24   and over again.  You're picking four digits.

25             What Dr. Burger said was, four digits, three digits, it

1    doesn't matter.  That is a deterministic algorithm, which is

2    expressly contemplated by the patent.

3        And, indeed, Dr. Mercer also conceded in his testimony

4    that the patent contemplated -- the patent the claims would

5    contemplate deterministic algorithm.  The same thing, over and

6    over again.

7        THE COURT:  Okay.

8        MR. LEHR:  The second thing, your Honor, is there's a

9    notion that somehow Dr. Burger should have read a source code,

10   or something like, or that the evidence wasn't sufficiently

11   detailed to identify exactly what Sprint does.  Although Mr.

12   Nehme testified about it, we had vendor documentation, they

13   didn't contradict it.

14       I've heard nobody from Sprint get up and say, the way

15   Dr. Burger says it's done, it ain't done that way.

16       The record evidence is basically what Dr. Burger said

17   is what Mr. Nehme conceded, so I don't know really what the

18   issue is there.

19       This notion, again, of the notion of Dr. Burger's

20   testimony, your Honor put it exactly right.

21       Was he incredible?

22       I think the point Ms. Thompson was making is, he said

23   one thing in his deposition, he said another thing at trial.

24   Every single witness that I've ever seen does the exact same

25   thing.

1          In point of fact, however, there is no testimony from
2    Dr. Burger that --
3          THE COURT:  Was that -- hold on a second.
4          Is that right, Ms. Thompson, that what you were
5    pointing out about the A, and not A, was that trial testimony
6    and deposition testimony?
7          MS. THOMPSON:  Your Honor, that was both trial
8    testimony and deposition testimony.
9          We, at trial, showed Dr. Burger his deposition
10   transcript and he testified at trial that that was his position,
11   that those systems are not parsing.
12         MR. LEHR:  That's exactly my point, your Honor.
13         It was cross-examination based on somebody based on
14   deposition testimony that they now say is inconsistent.  It
15   happens every single time I've ever cross-examined a witness.
16         The main point, however, is what Dr. Burger -- and I'm
17   not conceding he was inconsistent, we'll take Sprint's word for
18   that -- but what he was saying is, Step X here I say is not
19   parsing, and Step X here I say is parsing.
20         But he never testified that all the steps that are
21   performed by Sprint are not parsing.  Never one time.  Not in
22   his deposition, not at trial.
23         What they're doing is they're cherry-picking little
24   bits of alleged inconsistencies as the subcomponents of the
25   parsing algorithm that we say unequivocally is used by Sprint.

1          So that's pretty much all I have, your Honor, unless

2     you have a question.

3          THE COURT:  No.  Thank you, Mr. Lehr.

4          MR. LEHR:  Thank you.

5          THE COURT:  Anything further, Ms. Thompson?

6          MS. THOMPSON:  I just want to clarify for the Court Dr.

7     Mercer's testimony at trial regarding the deterministic

8     algorithm.

9          Dr. Mercer never testified that Sprint used a

10    deterministic algorithm.

11         Instead, what he said was that the deterministic

12    algorithm, as shown in the patent, still must follow a set of

13    rules of a grammar according to the Court's construction.

14         The sole evidence here, your Honor, regarding grammar

15    was Dr. Burger's conflicting irreconcilable testimony about

16    those three steps on the ENUM standard.  And especially at

17    trial, during cross-examination -- and he had the opportunity to

18    rehabilitate it at trial -- Dr. Burger still kept that

19    irreconcilable position.

20         He maintained the position that the Steps 4 through 6

21    were parsing and not parsing at the same time.  This is not an

22    issue of cherry-picking.  We're left with the sole evidence that

23    is irreconcilable.

24         The jury verdict on parsing is unsustainable.

25         Thank you, your Honor.

1          THE COURT:  Thank you, Ms. Thompson.

2          THE COURT:  All right.

3          So to damages, Mr. Riopelle.

4          MR. RIOPELLE:  Yes, your Honor.

5          Your Honor, the damages award in this case should be

6     stricken for two reasons.

7          The first reason is that the evidence was insufficient,

8     as a matter of law, because it lacks any acceptable methodology

9     or analysis.

10          And, secondly, should be stricken because Ms. Mulhern

11     at Comcast violated this Court's order by invoking the entire

12     market value rule after this Court had said there was no support

13     for it and they could not do that.

14          THE COURT:  Let me just -- you know, I meant to look

15     this up before and I didn't -- the order that I wrote, in terms

16     of the entire market value rule, normally what I do in those

17     cases -- and I assume I did in this case is -- I exclude

18     testimony.  And I think what I see was the testimony about the

19     income approach.

20          MR. RIOPELLE:  I have a copy if you want it.

21          THE COURT:  Well, do you know how I worded it, because

22     I don't normally strike portions of expert reports.

23          MR. RIOPELLE:  What you did, your Honor, was you

24     prevented them from putting on evidence of Sprint's revenue and

25     profit numbers.

1              THE COURT:  Okay.

2              MR. RIOPELLE:  You prevented her from testifying under

3      her income approach in her report.  And you found that she had

4      not put in any support for the entire market value.

5              THE COURT:  Okay.  All right.

6              So they didn't produce any numbers at trial?

7              MR. RIOPELLE:  That's correct.

8              THE COURT:  So I don't think -- so on the entire market

9      value rule, I have to say that my inclination is, because I

10     think I would have been pretty alert for that at the trial, and

11     I would have actually remembered -- but, you know, with judges,

12     when lawyers put on testimony that is contrary to the judge's

13     orders -- and I just read the order recently, not that I

14     actually have it from memory -- I would tend to think, you know,

15     you would see the smoke rising from my head, so I don't really

16     think that happened.

17             MR. RIOPELLE:  Okay.  Let me explain to you.  I'll do

18     the inefficiency first, if it would help our Honor to do that.

19             THE COURT:  Okay.

20             MR. RIOPELLE:  There is there no argument that she did

21     not put on any revenue numbers.  No argument that she did not

22     put on any profit numbers.  We're not saying that at all.

23             But she did testify that the products could not

24     function without the patented technology.

25             And here's an example of it at Page 773 of the

1    transcript, Lines 13 to 21.

2         "Question:  You agree, right, that the feature" -- and

3    the feature we're talking about here is Caller ID -- "the

4    feature had nothing to do with the patented technology at issue

5    in this case?

6         "Answer:  So I think it's related the same way I just

7    described, which is, as I understand it, the patents don't cover

8    the feature, but the patents are necessary to complete calls in

9    the SMI service generally, which is necessary to be able to

10   offer the service and that feature."

11        THE COURT:  So, this was cross-examination or --

12        MR. RIOPELLE:  This was cross-examination.

13        THE COURT:  All right.

14        Was her answer responsive to the question?

15        MR. RIOPELLE:  Was it responsive?

16        Well, I think she was responding to the question, yes.

17        THE COURT:  Okay.  So, I mean, the cross-examination,

18   you asked her a question, she gives a responsive answer, she

19   doesn't, obviously, violate anything that I told her not to do.

20        I take it after she said this -- I'm just -- did you

21   say, sidebar, your Honor?

22        MR. RIOPELLE:  I did not.

23        THE COURT:  All right.

24        Is there anything else you want to tell me about this,

25   on the entire market value aspect of this, because I'm happy to

1    hear about the other one in a minute.

2         MR. RIOPELLE:  Sure.  The point I'm trying to make,

3    your Honor, is that shield line.  That after this Court said

4    that there is no evidence to the entire market value rule, you

5    can't specify on these numbers, she came in and testified that

6    the patented features are, essentially, the driving point behind

7    the accused products.

8         THE COURT:  Even what you read to me didn't sound

9    exactly like that, but what she said was it was necessary for

10   the product to work.

11        MR. RIOPELLE:  It's necessary to be able to offer the

12   service and the feature.

13        She's basically saying, you can't offer this service,

14   this feature.

15        Here's an analogy, okay?

16        You have a car, and we're in a patent infringement case

17   over the steering -- the patent going to the steering wheel.

18        Now, I think you and I will agree you can't really

19   operate the car without the steering wheel.

20        THE COURT:  You know, I heard this analogy before.

21        Did you use this at the trial?

22        MR. LEHR:  Yes.

23        MR. RIOPELLE:  Yes.

24        THE COURT:  All right.  Okay.

25        MR. RIOPELLE:  You can't use -- I think we can agree

1    that you can't use the -- if you don't have a steering wheel,

2    you can't function the car.

3            THE COURT:  And this was all in the aid of having

4    something to do with cross-examination about one of the

5    Georgia-Pacific factors, right?

6            MR. RIOPELLE:  It treads into Georgia-Pacific Factor

7    13, that's correct.

8            THE COURT:  Okay.  All right.

9            Why don't you go on to the other one.

10           MR. RIOPELLE:  I think I will, since this one doesn't

11   seem to be working with you too well.

12           THE COURT:  There's a lot of reasons why this one is

13   not working, but maybe the other one you'll do better.

14           MR. RIOPELLE:  All right.

15           So, the position here is that the evidence is

16   insufficient, as a matter of law, because she's put -- she has

17   lacked an acceptable methodology and analysis.

18           Now, what is the issue we should be focusing on?

19           Was the verdict supported by sufficient evidence?

20           I think that's -- we have to -- was there sufficient

21   evidence to support the verdict?

22           And Comcast's position in their papers is that because

23   the verdict was in the range of numbers proposed by the parties,

24   then there has to be sufficient evidence, and it has to be

25   reasonable.

1          THE COURT:  Well, if that's what they're saying, then I

2     think you've got a point that that is not actually, I think, the

3     standard.

4          MR. RIOPELLE:  Well, but I think the point we have to

5     recall is that only Ms. Mulhern, Comcast's expert, proposed any

6     numbers.

7          THE COURT:  Right.  Dr. Aron and said, essentially,

8     there's a bunch of problems with her analysis.

9          MR. RIOPELLE:  That's correct.

10         But she did no mathematical analysis.  She admits that

11    she did no mathematical calculations for the numbers.  She said

12    that she picked the numbers based on her experience.

13         Explicitly she said, I selected the number I thought

14    was most appropriate.

15         And she --

16         THE COURT:  Actually, let's just back up for a second,

17    Mr. Riopelle.

18         So, as I recall -- and when I say "as I recall," this

19    is from reading the briefs not, from remembering the trial, Ms.

20    Mulhern said, essentially, the method of analysis here was

21    essentially a comparable sale, whether it was a sale of

22    Hewlitt-Packard and these packets -- these patents to Comcast,

23    right?

24         MR. RIOPELLE:  She discussed that.

25         THE COURT:  Okay.  But from that, because of whatever

1      the price was that Hewlitt-Packard sold them, that's somehow

2      where she came up with the 2.5 to $4 million, right?

3              MR. RIOPELLE:  Yes.  And just to be clear, the purchase

4      price, Comcast paid $2.5 million to purchase these patents --

5              THE COURT:  The whole budget.

6              MR. RIOPELLE:  -- the whole budget -- from

7      Hewlitt-Packard.

8              Her $4 million number was based on testimony from Mr.

9      Marcus who had said they had valued as much as 4 million, but

10     the purchase price in the contract was 2.5.

11             THE COURT:  And, as I recall, not only did Ms. Mulhern

12     not talk about the fact that there were multiple patents -- and

13     there might have even been foreign patents, I don't remember --

14     there were a lot more than just the intellectual properties that

15     grew into these three patents, or the applications, or whatever

16     it was exactly -- but Dr. Aron, she didn't say when she was

17     criticizing what Ms. Mulhern did, she didn't say anything about

18     the fact that there were multiple patents either, did she?

19             MR. RIOPELLE:  I don't have testimony in front of me,

20     but I believe she did.  And I know I specifically cross-examined

21     Ms. Mulhern on the fact that there were more than -- more

22     patents that were part of that purchase than the three that we

23     were talking about here.

24             And I --

25             THE COURT:  And, you know, you may be right.  I was

1    basing that on my memory of the trial, which is a pretty bad

2    thing to actually base something on.

3         Okay.

4         MR. RIOPELLE:  Just so you understand my

5    representation, I did not look at that issue before we came into

6    Court today.  I would be shocked if I did not ask both Dr. Aron

7    and Ms. Mulhern that during trial.

8         THE COURT:  Well, I think you probably did, because now

9    that I'm thinking about it, I think I remember why, a couple of

10   days ago when I was reading these things, why I was thinking

11   that hadn't occurred, but now that you're saying it, I think it

12   actually did occur.  It's all fitting into my head.

13        But, in any event, I'm sorry, I took you astray.  You

14   were telling me how the 2.5 to $4 million range came up, and I

15   couldn't remember the range, but now what you're saying about

16   Mr. Marcus' testimony, that strikes a cord, too.

17        So, but your main -- well, it seems like your main

18   complaint -- I guess there are two things.

19        One of which is, you know, you said methodology.  And

20   the responsive part was, if you objected to the methodology, why

21   didn't you move to exclude it before trial?

22        MR. RIOPELLE:  Right.  So there's no -- there's no --

23   again, we did not move in a Daubert.

24        THE COURT:  No, no, but, I mean, I guess part of the

25   thing is that -- I mean, I guess what it is, is -- here's the

1      scenario, right?

2           You have a report that's written by Ms. Mulhern, it's

3      got at least two theories in it, you move to exclude one, I

4      grant it, then we go to trial, she testifies as to the one, you

5      cross-examine her on it, you have Dr. Aron point out some

6      weaknesses.

7           And now, in essence, you're saying, oh, by the way,

8      Judge, on Daubert she should be out.  It's kind of late.

9           MR. RIOPELLE:  I understand what you're saying.

10          Let me say this.

11          I believe that if we had moved on Daubert on this

12     methodology, you would have not drafted, but we did not.

13          And, so, the question is, have we waived, have we

14     waived that, and the case law is clear that, no, we have not.

15          The Daubert decision from the Supreme Court, itself,

16     draws a distinction between admissibility and sufficiency.  And

17     it explicitly says that even if a court just makes a

18     determination, or the evidence is admitted, that still doesn't

19     mean it's sufficient.

20          And as late at 2012, the Fed Circuit in the Laser

21     Dynamic case, which, if you want the cite is --

22          THE COURT:  No, no, that's all right.

23          MR. RIOPELLE:  In the Laser Dynamics case, it affirmed

24     a trial court that granted a new trial on damages based on lack

25     of methodology and analysis, even though no Daubert had been

1          done in that case.

2                    And, so, you know, hindsight is 20-20.

3                    Should we have moved for a Daubert?

4                    Maybe we should have, but it does not waive our ability

5          to say that the evidence that she put in, still does not meet

6          the requirements of methodology and analysis, especially as the

7          damage law has been evolving with the Federal Circuit.

8                    THE COURT:  So your view is that it has to,

9          essentially, meet Daubert just as if there had been a Daubert

10         Motion beforehand, or is there some -- some -- for lack of a

11         better word, relaxing of the standard?

12                   Because it would seem -- I mean, it would seem in a way

13         -- it would seem in a way almost unfair to have some -- to have

14         something that could have been corrected at the trial if you

15         made a timely objection.

16                   MR. RIOPELLE:  Yes.  And, your Honor, the case law

17         talks about that.  The case law does bring up the concern that

18         you should raise this beforehand, because as you're putting, in

19         this case the plaintiff, has a disadvantage by, essentially,

20         saying, got you.

21                   The case law raises that concern.

22                   THE COURT:  And what does the case law say about it?

23                   MR. RIOPELLE:  It comes out both different ways.

24                   It comes out in the Laser Dynamics case, but the fact

25         of the matter is, if the testimony does not have a -- on a Rule

1    702, putting the Daubert aside -- but the Rule 702, if it

2    doesn't meet the requirements for expert testimony -- and in

3    this case since we're talking about patent damages -- a

4    sufficient methodology or analysis, then it's still not

5    sufficient.

6         THE COURT:  So what did Ms. Mulhern say when say

7    when -- actually, based on what you told me you probably can't

8    answer this question -- what did she say when you asked her,

9    well, what about these other patents?

10        I mean, but since you -- you hadn't really -- that's a

11   question I would have, because it seems to me that there's two,

12   for lack of a better word, methodological questions here.

13        One is, did she, essentially, pick a good starting

14   point, the 2.5 4 four million.

15        And the second is, the multiplier, so to speak, that

16   she used to approximate for the patents that are invalid and are

17   known to be infringed, you know, was that a reasonable thing?

18   Not a rule of thumb, but a reasonable thing.

19        And to some extent -- I thought it was the case, but I

20   may be hazing things over to -- was it something that Dr. Aron

21   also said a multiplier of three was a reasonable thing?

22        MR. FINKELSON:  She didn't.

23        Okay.  So the record is clear, Dr. Aron did not testify

24   to that at trial.  Dr. Aron had that in her expert report, and

25   Comcast asked Ms. Mulhern about that, and Mulhern said, well, it

1    was Dr. Aron who said that in her expert report, and that's

2    where they got the multiplier of three.

3            So, just --

4            THE COURT:  No, no, I appreciate it, because these are

5    details that --

6            MR. FINKELSON:  I think the concern is -- here's the

7    way I would put it.  I'm not sure of, and maybe I should be, I

8    wasn't focusing so much on the issue about how many patents were

9    part of the purchase price.  To me, you know, there was evidence

10   on that, and, you know -- so the jury didn't like my point.

11           THE COURT:  So, are we saying that, yeah, okay, the

12   2.5, or 2.5 to 4, are you saying, yes, okay, Judge, we'll spot

13   them that one?

14           MR. FINKELSON:  I think the 2.5 is in evidence.  It's

15   the purchase price.

16           THE COURT:  Right.

17           MR. FINKELSON:  My problem -- the issue is why there is

18   no sound methodology or analysis, is that her opinion is that

19   Sprint should pay $15 million on the '008, Sprint should pay --

20           THE COURT:  Right, 1.5.

21           MR. FINKELSON:  -- 1 million and 500, and we have no

22   idea how she got to that number.

23           It's a black box.  We don't know.

24           The closest we came to having any idea of about how she

25   got to a number is she said at trial, she said, well, they

1    valued it at 2.5 to 4.  And, so, you have a multiplier, and, so,

2    maybe that's seven-and-a-half to 12.

3           Now, that was nowhere in her report.  Nowhere.

4           THE COURT:  Okay.

5           MR. RIOPELLE:  Yes, I objected to things being outside.

6           THE COURT:  I couldn't remember.  I knew you objected

7    to something, but I couldn't remember what.

8           MR. RIOPELLE:  I -- again, I don't want to mislead this

9    Court.  I objected to testifying outside her report.  I believe

10   on GP Factors 6 and 8.

11          I can't recall right now, as I sit here, whether I

12   specifically objected to that.  The problem with it is -- and

13   even if I recall what happened -- if you recall they had a

14   big -- they had a chart of the Georgia-Pacific factors up on the

15   screen.

16          And they asked -- they asked her what of the purchase

17   price, and she said 2.5 million.  Well, that's in evidence and

18   that was in her report.

19          And they said -- she said, oh, they valued, you know,

20   up to 4 million.  That was in evidence and that was in her

21   report.

22          And she said that, you know, you have to raise it by a

23   factor.  And she actually testified at trial that she thought

24   that the factor should be higher than three, but she said Dr.

25   Aron had used three in Dr. Aron's report.

1          She didn't say in her report that there should be rated
2     by some factor, and had not given a number there either.
3          So that was fine.  That is not testifying outside the
4     report.
5          It wasn't until the very end when she lumped it all
6     together really quickly and said, to me that can be 7.5 to 12
7     million.
8          Well, there was no way of objecting.
9          If I stood up and objected at that point and said,
10     well, that's not supported by her report.
11          You would have said, well, that's in the report, that's
12     in the report, that's in the report.
13          THE COURT:  But I guess in a way, I'm almost missing
14     the point of, you said all these things were in the report.  It
15     seems like the thing at the end was basically just multiplying
16     things that were in the report.
17          MR. RIOPELLE:  Well, no.  Again, and this is where --
18     her opinion, her opinion in her report, not in her report, but
19     her opinion that she stated at the beginning of her testimony,
20     and the opinion that she stated at the end of her testimony is
21     that Comcast -- sorry -- Sprint should pay 16-1/2 million
22     dollars.  15, one, and five.
23          That was her opinion.  There is no support for that.
24     There's no -- there was no methodology, it's a black box, she
25     has given the Court no ability to test how she got to those

1    numbers.  It's just not there.

2          I mean, what Comcast will probably stand up and say is,

3    Mr. Riopelle is focusing on the wrong things.  He shouldn't be

4    focusing on what she had testified to.  He should be focusing on

5    the verdict.

6          THE COURT:  What was the verdict?

7          MR. RIOPELLE:  The verdict was 7-1/2, and, so was their

8    testimony.

9          The fact of the matter is, only Mulhern put in numbers.

10   Sprint and Comcast did not put in numbers.

11         So her numbers had to have some bearing on the verdict.

12   We don't know if it was a compromised verdict.  We don't know

13   whether they did the math and went 2.5 times three.  We don't

14   know how they going got there, but her numbers had to have some

15   bearing on it.

16         And there is no sound methodology or analysis for her

17   numbers, and, so, the call is on damages.

18         THE COURT:  I'm sorry.  The thing for which there's not

19   a methodology is -- I'm sorry -- bear with me, is what?

20         MR. RIOPELLE:  Her opinion is that Sprint should pay 15

21   million on the '008, Sprint should pay $1 million on the '916,

22   Sprint should pay $500,000 on the '046.

23         THE COURT:  Well, so remind me, because I don't

24   remember, I thought the apportionment was, essentially, here's

25   the total, and here's how I divided it up, as opposed to how I

1    figure out the reason for the three, and I added them up

2    together, and you get that.

3              MR. RIOPELLE:  You're correct.  She reached a

4    conclusion of 16-1/2 million, and then said, here's how I

5    divided it up.

6              THE COURT:  Okay.  Is the point that you are objecting

7    to the 16-1/2 million, or the dividing it up, or both?

8              MR. RIOPELLE:  Both.

9              THE COURT:  I think I understand the dividing it up.

10             You're saying there's no explanation, period, as to why

11   she apportioned it the way she did.

12             MR. RIOPELLE:  That is correct, but there's no

13   explanation of how she got to 16-1/2 million.

14             THE COURT:  Okay.  All right.

15             MR. RIOPELLE:  And asked, when she was asked that

16   specific question, her answer was, I selected a number that I

17   thought was the most appropriate, which is exactly what the

18   court in the GP case instructed.

19             Do you have any other questions on the damages part?

20             THE COURT:  No, no, let me hear from Mr. Lehr.

21             Thank you, Mr. Riopelle.

22             MR. LEHR:  It's actually Mr. Fenwick on this one.

23             THE COURT:  That's right.  I forgot the way you did it

24   at trial.

25             MR. FENWICK:  So, your Honor, I think I'll pass on the

62

1      commentary regarding the entire market value rule.

2               THE COURT:  I think you can safely do that.

3               MR. FENWICK:  I appreciate that.

4               On Mr. Riopelle's black box argument, as predicted, I

5      am here to tell you that the issue that we're dealing with today

6      is, was there sufficient evidence for the jury to consider 75?

7               It's not, was the methodology --

8               THE COURT:  Well, so, let me just ask.

9               Let's assume, for the sake of argument, that either

10     myself, or somebody else, might be thinking whatever it is that

11     your expert said went into the ultimate verdict, so whether or

12     not your expert demonstrated sufficient methodology and

13     reasoning is a legitimate topic of concern.

14              Are you saying that Mr. Riopelle has a point or what?

15              MR. FENWICK:  No, your Honor, not at all.

16              Ms. Mulhern testified at the starting point of her

17     analysis that in 2008, there was this patent purchase

18     transaction which had a nominal amount of 2.5 million, which Mr.

19     Marcus testified that the patents were worth more than 4 to

20     Comcast.

21              There was evidence presented by both sides as to

22     whether the 2.5 million overstated or understated the value of

23     the patents.

24              THE COURT:  Well, he doesn't seem to be challenging you

25     on that.

1           MR. FENWICK:  Right.  And among that evidence, your

2   Honor, was the fact that the two of the patents-in-suit hadn't

3   been applied for, much less at issue at the time of that

4   transaction.

5           There was evidence about provisions of the contract

6   that said you can't assert the patents for a certain period of

7   time, except under certain circumstances.

8           THE COURT:  Right.

9           MR. FENWICK:  So, there was evidence from the Sprint

10  side that maybe we should deduct some value from it, because of

11  concerns about Verizon, that some of the purchase price should

12  be added to that.

13          Comcast came back and pointed out there had been an

14  covenant not to sue Verizon, but --

15          THE COURT:  Well, these are all things -- but I guess

16  what Mr. Riopelle is saying -- if I'm understanding his argument

17  right -- is that saying, okay, so we get some number here

18  somewhere in the 2.5 to $4 million range, and then we multiply

19  it by three.

20          I think what he's saying is, multiplying it by three,

21  it more or less just comes out of thin air, and it doesn't sound

22  exactly like the 25 percent rule, but, you know, rules of thumb

23  -- and I don't think Ms. Mulhern said rules of thumb -- but they

24  are not exactly a favored item of the Federal Circuit.

25          So where goes the multiplier comes from?

1        MR. FENWICK:  So, your Honor, what Ms. Mulhern

2    testified to is there is a lot of uncertainty around that patent

3    sales transaction that doesn't exist in the hypothetical

4    negotiation.

5        One of them is uncertainty about validity, enforcement,

6    and infringement.

7        There are other uncertainties as well that attend that

8    transaction that she testified about.

9        THE COURT:  Name one.

10       MR. FENWICK:  Your Honor, one of the things she

11   testified was, it was a purchase that was made for defensive

12   purposes, and purchasing for defensive purposes is akin to

13   buying an insurance contract.

14       THE COURT:  Right.  Okay.

15       MR. FENWICK:  And, so, you know, you don't pay your

16   insurance premium, the full amount of the damages you expect to,

17   you know, occur, if the insured then occurs.  So that's one

18   important example.

19       Now, it wasn't just Ms. Mulhern that testified about

20   this multiplier.  Dr. Aron, on cross-examination, testified to

21   the appropriateness of a multiplier of three to account

22   specifically for the uncertainty of infringement.

23       THE COURT:  So there was testimony in the record, and

24   not just Ms. Aron quoting Doctor -- I'm sorry -- Ms. Mulhern

25   quoting Dr. Aron, but Dr. Aron actually said here at trial,

1    yeah, a multiplier of three is a reasonable?

2              MR. FENWICK:  Yes, your Honor.  At Transcripts 1142 to

3    1152 there was extensive testimony from Dr. Aron about the

4    multiplier.

5              Ms. Mulhern's testimony on that point was 793 -- 739 to

6    740.

7              And even on redirect, Mr. Riopelle who, I think, likes

8    the dynamic of the fact that the multiplier is attributable to

9    an assessment at the time of the real world transaction, that

10   the patents might not ultimately be held valid, and might not

11   ultimately be held infringed.

12             Mr. Riopelle went back to Dr. Aron on redirect.  Went

13   right back to that multiplier.

14             So there was extensive testimony about the $2.5 million

15   purchase price, and about the multiplier, and about Dr. Aron's

16   view that a multiplier of three was appropriate as a baseline

17   rule, and also appropriate in this case to deal with the

18   uncertainty about infringement validity.

19             And lo and behold, the jury came back with 7.5.

20             And we weren't in the room, and we don't know how they

21   got there, but to suggest that there is not substantial evidence

22   for that outcome strikes me as not a very strong argument.

23             And --

24             THE COURT:  Well, particularly, if you say the 2.5 was

25   a reasonable data point to be starting with, assuming what you

66

1    said about -- I mean -- okay.  I think I understand your

2    argument on that.

3            MR. FENWICK:  And just to clarify earlier, there was no

4    objection at trial that this was outside the scope of the

5    report.

6            Mr. Riopelle stated he didn't remember.  There wasn't

7    any.  He did raise an objection with respect to the Georgia-

8    Pacific Factor No. 6.

9            THE COURT:  Yes, I looked that up in the last couple of

10   days.  I remember that one.  I didn't remember the others.

11           So what about apportionment amongst the three patents,

12   was that -- what did Ms. Mulhern attribute that to?

13           MR. FENWICK:  Well, she did testify, your Honor, that

14   there was larger amount attributable to the '008 patent, because

15   there were many more infringement call flows in connection with

16   the '008 patent.

17           Because, if you recall, your Honor, there was one of

18   the call flows that was alleged to have infringed the '008, but

19   not the others, was when one of 55 million Sprint CDMA

20   subscribers calls one of the numbers varied in the evidence, but

21   600,000, or a million-and-a-half or something, Airaves.

22           THE COURT:  So did Ms. Mulhern say at the trial, I

23   apportioned it based roughly on the volume of calls --

24           MR. FENWICK:  She said that --

25           THE COURT:  -- or based on the volumes of infringing

1     calls?

2             MR. FENWICK:  She certainly testified that the larger

3     number for the '008 had to do with the more extensive

4     infringement of that patent compared to the rest.

5             I know that the relative apportionment between '046 and

6     '916 had to do with the -- when those patents were issued, and

7     the damages period.

8             To be honest, I don't recall specifically whether she

9     addressed that specific point in her trial testimony, but that's

10    basis for that.

11            And to the extent that Mr. Riopelle has a problem with

12    the methodology used to got to the 16.5, and the apportionment,

13    that was a matter for Daubert in the pretrial.

14            The issue here is the sufficiency of evidence to get to

15    7.5.

16            THE COURT:  All right.

17            Thank you.

18            Anything else, Mr. Fenwick?

19            MR. FENWICK:  I don't believe so, your Honor.

20            THE COURT:  Thank you.

21            Mr. Riopelle?

22            MR. RIOPELLE:  Two very quick points, your Honor.

23            First of all, on your questions to Mr. Fenwick on the

24    apportionment, I think that goes to exactly the point I'm trying

25    to make.

1              She testified that in the '008, that she had it at $15

2       million, because there were a lot more calls to them, but that

3       was it.  I mean, there was no --

4              THE COURT:  Well, I guess in a way -- I mean there's --

5       I guess what I'm wondering, where is the dividing line between

6       they put enough, if you want to flush out the details of it,

7       that should be done on your time and not there's.

8              In other words, if -- and, you know, I haven't looked,

9       I don't know what Ms. Mulhern said -- but let's say that she

10      said, in terms of the 16.5 million, the '008 patent issued in

11      2008, or whatever it issued, and it involved 55 million calls,

12      and that's had a whole hell of a lot more calls than the other

13      two patents put together, and so I apportioned it as 15 million,

14      1 million, and 500,000.

15             Is that enough?

16             MR. RIOPELLE:  I don't know if that would be enough,

17      but I would tell you it would at least be something.  It would

18      at least be -- I would look at it in terms of how many calls

19      there were, and based on how long the patent had been at issue,

20      or something like that.  We don't even have that.

21             THE COURT:  Well, I guess what I'm wondering is, let's

22      say -- you know, you say a black box.

23             Let's just say she said -- which for all I know she did

24      say -- yes, the 16.5 million is based on my review of the

25      record, I would say 15 million, 1 million, and half a million.

1          Is there any duty on you to ask the question on

2     cross-examination to figure out whether that's, you know, true

3     black box analysis, or does she have to meet, so to speak, some

4     Daubert levels on direct examination, or why don't you just

5     confine your cross-examiner, and then the trial will get

6     reversed some time down the road?

7          MR. RIOPELLE:  I think the latter is true.

8          I mean, I don't have an obligation, I don't have a

9     burden on the damages in this case.

10          Frankly, it's one of the reasons we did not put on a

11     number through Dr. Aron, because her number was so flimsy, and

12     had no methodology, no analysis behind it, that if I put Dr.

13     Aron on and she testified to a number, now I would be -- we

14     would be having this discussion, and you would be saying, well,

15     you had Dr. Aron's testimony and her number, and they could have

16     based it on that, right?

17          THE COURT:  I think, actually, they did, but, you know,

18     we don't really know why the jury does these things.

19          MR. RIOPELLE:  We don't.  We don't know why the jury

20     does it.

21          But we do know that it's Sprint's position that the

22     evidence that Ms. Mulhern put in from a damage expert point of

23     view lacked methodology and lacked analysis.

24          And one other point I was going to say is, you just

25     raised the rule of thumb, and the 25 percent rule.

1          You should -- I would request that the Court look at

2     the GPNE case, because that's exactly what they did.

3          THE COURT:  The GPNE, that's in the Northern District

4     of California?

5          MR. RIOPELLE:  That's correct.

6          THE COURT:  Okay.

7          MR. RIOPELLE:  They just raised the same issue.

8          They said, well, this is like the 25 percent rule the

9     Federal Circuit has just struck down.

10         THE COURT:  I mean it's the kind of thing, you know, I

11    wonder about.

12         Okay.  All right.

13         Thank you, Mr. Riopelle.

14         I don't think you're going to get far in the entire

15    market value rule, but I will certainly give some thought to the

16    other one.

17         All right.

18         So, now, I think now Mr. Lehr, or Mr. Fenwick, it's

19    your turn to go first?

20         MR. FENWICK:  Mr. Fenwick, your Honor.

21         THE COURT:  Yes, I knew that.

22         MR. FENWICK:  I was answering the question and not

23    putting in my appearance.

24         THE COURT:  Okay.  Thank you.

25         MR. FENWICK:  I apologize for being --

1          THE COURT:  No, no, no, there's way too much

2     apologizing that goes on.

3          MR. FENWICK:  Then I retract my apology, your Honor.

4          So, on our motion, Judge, there are really three

5     issues.

6          There's the prejudgment interest, and the post-judgment

7     interest, and then the entitlement to ongoing royalty and what

8     we do.

9          THE COURT:  Is the post-judgment interest a disputed

10    matter?

11         MR. FENWICK:  I don't think post-judgment interest is

12    in dispute.

13         THE COURT:  Mr. Riopelle seems to be indicating it's

14    not.

15         MR. RIOPELLE:  It is not.  The only thing would be the

16    basis of what you apply to it.

17         MR. FENWICK:  What you apply to it.

18         THE COURT:  Okay.  So let's just talk about the

19    prejudgment interest, because I think what you're talking about

20    first is, basically, your calculation is -- I'm rounding it off

21    here to like $750,000 -- no, yours is 1.7, and Sprint's

22    $750,000, or something on that order.

23         MR. FENWICK:  That's approximately right.

24         THE COURT:  Right.  And I take that it if I agree, so

25    to speak, with the methodology, do either of you object to the

1    actual calculations of the other side, or is it the premises

2    that you are objecting to?

3            MR. FENWICK:  I think it's all in the premises.  The

4    math, I don't think --

5            MR. RIOPELLE:  There's no objection on the math.  It's

6    purely the underlying methodology.

7            THE COURT:  Okay.  So, the question that I have for

8    both you, but, Mr. Fenwick, you're going first is, your -- well,

9    I guess, actually, everyone agrees that I have some amount of

10   discretion on this prejudgment interest question, right?

11           MR. FENWICK:  The question is directed to your

12   discretion, that's correct.

13           THE COURT:  And the hypothetical negotiation that led

14   to a -- to the various pieces of testimony about damages,

15   doesn't -- it talks about the 2006 time frame, right?

16           MR. FENWICK:  Yes.

17           THE COURT:  And the agreement by the jury's verdict was

18   that the parties would have reached an agreement for $7.5

19   million at that time, right?

20           MR. FENWICK:  Yes, late 2006.

21           THE COURT:  And, essentially, your theory is that

22   because they would have reached an agreement at that time,

23   that's when the money would have changed hands, and, therefore,

24   prejudgment interest running on the entire 7.5 million from that

25   time is something that would compensate Comcast for failure of

1    Sprint to reach a deal when they should have reached a deal?

2         MR. FENWICK:  Yes, in substance that's right, Judge.

3         You go back to the time of the hypothetical

4    negotiation.

5         Is it within the limitations period?

6         It is.

7         The jury was asked the question, what would these

8    hypothetical negotiators have agreed to in late 2006?

9         These hypothetical negotiators who have the benefit of

10   the rule of thumb.  And, so, they understand that when they're

11   negotiating that there are going to be patents that issued

12   subsequent to that date, there are going to be products that

13   come into play, infringing products that come into play

14   subsequent to that date.

15        So I'll grant that at some level it seems a little

16   counter-intuitive that you're granting -- that you're giving

17   prejudgment interest prior to the issuance of the patents, and

18   prior to the release of certain of the accused products.

19        THE COURT:  But in a way that doesn't actually strike

20   me as -- I mean, you know, you may be right that it's counter-

21   intuitive -- but the parties -- all the numbers that either of

22   the damages experts were talking were, essentially, things that

23   would be numbers that would be agreed to in 2006.

24        And I'm pretty sure nobody said anything about, well,

25   if we have 2008 deal, let's depreciate that a little bit for the

1    fact that there was inflation between 2006 and 2008, right?

2         MR. FENWICK:  That's right, your Honor.  All the

3    testimony, all the jury instruction were all about a single

4    negotiation.

5         But there was no -- no one suggested an argument or

6    evidence at the trial that there ought to be three negotiations,

7    or three different payment points.  It was all about one deal

8    struck in late 2006, by the hypothetical negotiators.

9         THE COURT:  And was the deal for a lump sum?

10         MR. FENWICK:  And a deal for a lump sum.

11         And we'll get to the ongoing royalty issue.  That

12    concerns what the lump sum covers, but, yes, there was a lump

13    sum on both sides.  Both experts agreed lump sum, negotiate one

14    negotiation late 2006, the theory, that was presented to the

15    jury is, the negotiators understand the temporal aspects of

16    products being issued later, patents being issued later.

17         So that's all baked into this construct of a

18    hypothetical negotiation.  And if it is at all counter-intuitive

19    that we're talking about prejudgment interest before the patent

20    -- some of the patents, and, of course, some of the products,

21    that is because of the intuitive nature of the drive, the

22    hypothetical negotiation construct.  It bakes in all those

23    facts, and that's completely consistent with the testimony of

24    both Ms. Mulhern and Dr. Aron.

25         Now, there's a separate issue of time value of money.

1          We don't ask the jury to do a net present value

2     calculation to determine, you know, what's the value of that

3     2006 negotiation today in 2014.  And because we don't ask the

4     jury to do that, we have a toll concept of prejudgment interest,

5     but it's clear that you don't apply prejudgment interest to the

6     extent that the time value of money is already incorporated into

7     the analysis.

8          And that's why once we were alerted to that issue, we

9     retracted our original request, and --

10         THE COURT:  I'm not worried about your original

11    request, because you retracted it.

12         MR. FENWICK:  Right.  So we're only talking about

13    October of 2008 to the trial, because the $2.5 million, the

14    amounts that were used as the basis for the analysis by both

15    damages experts, that was September 2008.

16         THE COURT:  Okay.  Wait a second.

17         So you said it was the September of 2008 money, because

18    that was based on -- that's when the Hewlitt-Packard --

19         MR. FENWICK:  Yes.

20         THE COURT:  Actually, I saw your letter, obviously

21    lowering you prejudgment damages interest, and I thought you

22    said, I thought I saw the word "double counting," so I stopped

23    reading at that point, because I understand that concept.

24         Are you telling me there was something else, other than

25    double counting, going on?

1          MR. FENWICK:  No.  It would have been double counting

2     award prejudgment interest from January 1, 2007 through

3     September 2008, because the time value of money had already been

4     factored into the $2.5 million purchase price.

5          THE COURT:  Okay.  I understand what you're saying,

6     which is, even though people were talking about the 2000 -- this

7     hypothetical negotiation would take place in 2006 -- and you're

8     talking about 2008 dollars, because that's what they were basing

9     it on.

10          So, therefore, the difference between your first

11     calculation, and your second calculation, was just the

12     difference between starting in 2006 and starting in 2008?

13          MR. FENWICK:  Yes.  Starting January 1, 2007, versus

14     October 1, 2008.  We tried to be conservative.

15          THE COURT:  Okay.  I got that.

16          MR. FENWICK:  I'm smiling for the record.

17          So, yes, we tell the jury here's the question you're

18     solving for, what would these hypothetical negotiators have done

19     in late 2006.  Knowing that things are going to happen in the

20     future, we don't tell them to solve to the net present value on

21     the product.  That's why we do the interest calculation.

22          But it's a fairly straightforward issue, and the cases

23     are, I think, all pretty consistent in the way they treat this,

24     even in a situation where there are multiple patents with

25     different issue dates.

1          THE COURT:  Well, you say the cases are consistent.  I

2     actually thought that this very precise issue, it seems to me

3     that there were -- there weren't any cases addressing this.

4          MR. FENWICK:  There are -- there are cases where these

5     are the circumstances, where you have multiple patents with

6     different issue dates, and multiple infringing products with

7     different release dates.  And the parties and the Court all look

8     to the date of first infringement.

9          THE COURT:  But without -- without --

10          MR. FENWICK:  Without having any --

11          THE COURT:  What I would have said in law school, they

12     decided the sub silencio, meaning they didn't really decide it

13     at all, but they just assumed it.

14          MR. FENWICK:  They didn't address it explicitly, I'll

15     grant you that, that precise issue.

16          THE COURT:  Okay.  I think we're on the same page

17     there.

18          All right.

19          Anything else, otherwise I'll hear from the other side?

20          MR. FENWICK:  On the entitlement -- do you want me to

21     go on to the royalty issue or come back to that later?

22          THE COURT:  You can address that right now.

23          MR. FENWICK:  The issue there, your Honor, is does the

24     lump sum address to trial, and only to trial, or the life of the

25     patents?

1           There was no --

2           THE COURT:  What do you think -- you know, I understand

3    it when people say things like, committed to your discretion,

4    Judge.  I also understand when people say, question of law.

5           The question that you are now addressing, tell us, is

6    this a discretionary question, or am I doing some kind of

7    interpretation of what happened at trial?

8           I'm not sure what the framework is that I'm supposed to

9    be looking at this at.

10          MR. FENWICK:  I think this falls more in the category

11   of you determining what happened at trial, your Honor.  I think

12   the question of post-trial relief is typically, you know, a

13   separate question.

14          And how that gets addressed, there may be some element

15   of discretion in that, and I think the weight of the cases, we

16   see the judges asking the parties to go try to negotiate that

17   issue.

18          THE COURT:  Well, in that regard, in the 2008 analysis

19   for double counting, you're just going at -- and it seems

20   consistent with this approach -- was anything said in the trial

21   testimony of either expert -- let me step back.

22          So we know that Comcast, or Comcast's predecessor, but

23   somebody bought these patents from Hewlitt-Packard, and they

24   bought them outright.

25          And, so, then, we were -- then the experts were talking

1    about licensing the patents.

2           Did any one every discount that price because they --

3    it was for a limited term?

4           MR. FENWICK:  Because the -- I don't recall any

5    expressed testimony about the purchase price being discounted,

6    based upon a limitation of terms at the trial.

7           There was testimony by Dr. Aron certainly that a sales

8    transaction is different from a license transaction.  I don't

9    recall whether she made her point there.

10          But I'll stop there, your Honor.  I don't recall.

11          THE COURT:  Okay.  Well, it seems to me, I think to the

12   extent that the question is -- I guess there's a number of

13   different questions that could be asked here -- one of them

14   which is, what exactly did the jury decide or think they were

15   deciding?

16          And, you know, my belief is that -- and I'm pretty sure

17   the jury wasn't thinking about the difference between 2008 to

18   the time of trial, and 2008 to the end of time, or to the end of

19   the patents.  This wasn't an issue that was presented to them.

20   This were just given a bunch of numbers, and possible lump sums,

21   and various information about how to calculate that.

22          None of which, I think, had anything to do with

23   discounting the value, depending on the length of time of trial.

24          And to some extent we know that or I think we know

25   that.  I can't remember when the last time was that I continued

1    a trial, but I don't think the experts changed their opinion

2    based on -- you know, actually, I don't know.  It would be a

3    question.  But I'm pretty sure that if I continued the trial,

4    the experts could not have come in to trial and say, our lump

5    sum has gone up 5 percent, right?

6              MR. FENWICK:  Possibly, your Honor.  I don't know.  I

7    mean that wasn't the circumstance.

8              But there's no question at all, no ambiguity at all

9    that the analysis of the experts that they performed during the

10   course of the case was lump sum to time of trial, and not

11   covering the post-trial period.

12             And that was expressed in the reports, and in the

13   depositions, it was absolutely clear.

14             The only specific evidence at trial on the point was

15   that it's to time of trial.

16             Now, that came from Dr. Aron.  And the reason that came

17   from Dr. Aron is that when Ms. Mulhern testified, she neglected

18   to say, to time of trial when she testified, and that was an

19   oversight on her part.  It was a oversight on our part.  I grant

20   that.

21             So we came back and clarified it in cross, and we

22   established, through Dr. Aron, that her analysis was to time of

23   trial, that she understood that Ms. Mulhern's analysis had been

24   to trial of trial, that everybody agreed that the analysis was

25   to time of trial, and that was the proper analysis.

1          And, so, that's what the jury heard on this question.

2    And they also heard that the question they were addressing is

3    damages, not future stuff, but past damages by way of -- it was

4    either opening statement or closing argument.  I don't remember

5    specifically which, but they were told the questioner's question

6    was addressing was past damages, so that's the only evidence

7    they had.

8          Now, would it be a little cleaner if Ms. Mulhern had

9    been more specific in her testimony, and specifically consistent

10   with her report on that exact point?

11         I grant you it would be a little cleaner, but we think

12   we went back and cleaned that up and clarified it.

13         THE COURT:  You know, I guess one of the other things I

14   wondered is, both experts -- I say "both experts," but I don't

15   actually remember if Dr. Aron wasn't under a obligation to

16   testify about everything -- but certainly the sense that I got

17   was, everyone thought it was only possible that the only damages

18   appropriate here was the lump sum, so it's kind of odd to hear

19   oh, yes, so now that we've had a trial, let's establish a

20   reasonable royalty?

21         MR. FENWICK:  But post-judgment is a separate question,

22   your Honor.

23         THE COURT:  But it --

24         MR. FENWICK:  Maybe -- maybe post-judgment, it's

25   another lump sum, but the question is whether the lump sum that

1    was -- that they testified to is adequate to cover the entire

2    life of the patents, and they didn't have opinions about that,

3    and they didn't testify to that.

4        What they testified to was their analysis for a lump

5    sum that covers to the time of trial, so maybe the second piece

6    of this is another lump sum.

7        THE COURT:  WELL, did anybody talk about -- I guess

8    nobody testified -- I guess it is not even inconsistent -- when

9    people testify about fully paid-up licenses, does that mean to

10   the end of the patent, generally?

11       MR. FENWICK:  I think in a typical commercial sense, a

12   fully paid-up license means for the life of the patent, yes.

13       THE COURT:  Was there any testimony by either expert on

14   that subject?

15       MR. FENWICK:  I don't recall, your Honor, any testimony

16   using fully paid up.

17       THE COURT:  Okay.

18       MR. FENWICK:  I recall testimony about a lump sum.

19       THE COURT:  All right.

20       Is there anything else that you want to say about that.

21       MR. FENWICK:  Only, your Honor, to make a point that I

22   think the parties have -- well, we believe we should get a

23   ruling that we're entitled to an ongoing royalty in some form.

24   The parties are in agreement that a mediation directed to that

25   issue can a wait until after the appeals.

1          THE COURT:  All right.

2          Thank you, Mr. Fenwick.

3          THE COURT:  Mr. Riopelle.

4          MR. RIOPELLE:  Your Honor, would you like to discuss

5    prejudgment interests or ongoing royalty first?

6          THE COURT:  Well, why don't you just address the

7    prejudgment interest first.

8          MR. FINKELSON:  Okay.  On the prejudgment interest, the

9    fact of the matter is, it's Comcast's position that has changed,

10   because they read the briefs in the 10/13 case, so they are

11   trying to skirt it and have it both ways.

12         THE COURT:  I haven't read the briefs in the 10/13

13   case.

14         MR. FINKELSON:  Well, they have, and that's what

15   they're trying to do.

16         In this case they said in their opening brief

17   prejudgment has to be tied to hypothetical -- the date of the

18   hypothetical negotiation.

19         And then they came in their reply brief and said it has

20   to be tied to the date of the hypothetical negotiation.

21         And then they realized then in the 10/13 case it's tied

22   to the date of the hypothetical negotiation, it's going to be a

23   very large number, because the date of the hypothetical

24   negotiation in the 10/13 case is the year 2000.

25         THE COURT:  Okay.

1            MR. RIOPELLE:  So that's why they now, after they

2      argued it has to be decided to the date of the hypothetical

3      negotiation, they now said, no, we'll move it from the date of

4      the hypothetical negotiation, so about 2008.

5            The fact of the matter is, your Honor --

6            THE COURT:  Well, so, are you objecting to that in this

7      case?

8            MR. RIOPELLE:  I'm not objecting to the unilateral

9      offer for them to lower their thing.  I don't agree with their

10     methodology, but I'm not objecting to it.

11           THE COURT:  Okay.

12           MR. RIOPELLE:  I will say this, though.  There is no

13     case law that requires the prejudgment interest be tied to the

14     date of the hypothetical negotiation.

15           Does it make sense in a lot of cases?

16           Yes, of course it does.

17           But there's nothing that requires it to be tied to that

18     date.  And, in fact, the two cases that they cite in their

19     briefs, they have misrepresented.

20           The one that --

21           THE COURT:  I saw the one called <u>Mars, Inc.</u>

22           MR. RIOPELLE:  <u>Mars</u>, they misrepresented.

23           THE COURT:  Yes, yes, I didn't think that was their

24     best day.

25           MR. RIOPELLE:  Yes, okay.  And you've already figured

1     out the other one, the Fleming v. Escort, in which --

2              THE COURT:  Have I figured out the other one?

3              I don't --

4              MR. RIOPELLE:  You said it.  You said it when you said

5     that it was sub silencio.

6              THE COURT:  Oh, okay.  I only figured that out, because

7     I didn't read that, you said it in your brief, and I was pretty

8     sure that the way that Mars had showed up in the brief, that you

9     had scored a point.

10             MR. RIOPELLE:  I need all the points I can get.

11             The fact of the matter is, the hypothetical negotiation

12    is just that.  It's a hypothetical tool that we use to try to

13    determine what the damages will be in the case.

14             But the statute requires that damages and prejudgment

15    interest can't accrue until a patent issues.  There is no

16    dispute that the '008 patent, and '046 patent didn't issue until

17    2012.  And there's no dispute under the law that you can't

18    infringe a patent until the patent issues.

19             We're not disputing the fact that the damages figure is

20    7-1/1 -- well, we are -- but not here.

21             THE COURT:  I understand what you mean.

22             MR. RIOPELLE:  7-1/2 million.

23             But for the purposes of prejudgment interest, it makes

24    sense to do the prejudgment interest from the time when the

25    patents issued, or when the patents, more precisely, the time

1     that the patents were infringed.

2          THE COURT:  So let me ask you a question, which is.

3          Do you think the point of a hypothetical negotiation in

4     2006 is, particularly in connection with a lump sum, how much

5     would Sprint pay Comcast in 2006, to get all necessary -- to get

6     a license to these patents?

7          MR. RIOPELLE:  Yes, I have to say that.

8          THE COURT:  Okay.  Well, I think you do have to say

9     that.

10         MR. RIOPELLE:  Right, I do.  I do have to say that.

11         THE COURT:  So, how is it, if we're talking about the

12    time value of money -- and I understand what you're saying

13    about, you know, you don't owe royalties on a patent that hasn't

14    issued, and you don't owe royalties when you haven't infringed

15    anything.  But essentially, what's a reasonable conclusion from

16    the jury verdict is that the jury thought that Sprint should pay

17    $7.5 million to come back in 2006 to get this bundle of rights?

18         MR. RIOPELLE:  To get the bundle of rights to use the

19    invention through the expiration of the patent, yes, I think

20    that is reasonable, and I believe it's logical.

21         There there's nothing --

22         THE COURT:  And, so, I guess what I'm wondering is --

23    and I appreciate what you're saying about that is -- what's the

24    argument then -- how come -- if we all think that's what

25    happened, why I should I exercise my discretion not to start

1  charging Sprint for, you know, essentially, in 2008, but back

2  into the day from the fact that it didn't make the payment that

3  it should have made?

4          MR. RIOPELLE:  I think to be consistent, your Honor, if

5  you -- if you find that the hypothetical negotiation of 2006,

6  was for a lump sum payment for use of the invention, which is

7  what the jury instruction said, the use of the invention, in

8  terms of the expiration of the patents --

9          THE COURT:  Well, let's just say, to the time of the

10 trial.

11         MR. RIOPELLE:  I think that maybe different then.

12         THE COURT:  Okay.  Well, so run through both of those

13 scenarios.

14         MR. RIOPELLE:  Let's say if you are saying this is what

15 they would have paid for the bundle of rights on this to have

16 peace all the way through the end of time, then I think to be

17 consistent you probably have to say that, yes, that was the

18 money that they would have paid, and, so, we need to give them

19 the time value of the money, and they need to institute that.

20         If, however, we're saying it only goes through the time

21 of trial, which I don't believe the evidence supports, but they

22 say it only goes through the time of trial.

23         Then it's only by pure happenstance that a patent

24 issued in 2006, is being tried in the same case, is a patent

25 that was issued from the same -- owned by the same company, but

1    they're being issued in 2012.  They couldn't -- they couldn't

2    have acquired -- they sued us only on the '008 and only on the

3    '046.  They couldn't have acquired -- they only got damages

4    until 2012.

5            But now what they're doing -- and they admitted that

6    the '008 is one that they think is 91 percent of the damages --

7    they're saying this is a good deal for us, because now we'll go

8    back and we'll get prejudgment interest on something we couldn't

9    have collected damage on.

10           But if you do it all the way on the ongoing royalty I

11   think -- I don't like it -- but I think you have to be

12   consistent.

13           THE COURT:  So just like you would get more money in

14   the other case?

15           MR. RIOPELLE:  Let me just caveat that.  I'm not

16   counsel.

17           THE COURT:  No, no, I recall.

18           MR. RIOPELLE:  Do I get more money in the other case?

19           I think the issues are slightly different.  I do

20   believe that there are issues in the other case that the Court

21   has to address on the date of the hypothetical negotiation

22   versus limitations on the collection of damages.

23           And the differences in this case -- and I don't know

24   all the facts in that case -- but I don't know if that case has

25   patents that issued after the hypothetical negotiation date as

1    this case does.  I just don't know.  I just truly don't know.

2              THE COURT:  And I can't remember.

3              Do you know if briefing is finished on the other case?

4              MR. RIOPELLE:  I don't believe so.  My understanding --

5    and they probably know better than I do -- I believe Comcast has

6    file its opposition.  I don't believe Sprint has filed its

7    reply.

8              THE COURT:  Okay.

9              MR. RIOPELLE:  Is my understanding.

10             THE COURT:  All right.

11             I was just curious to know.  I think sometimes one

12   tries to do -- to be consistent on both sides.

13             MR. RIOPELLE:  I think the best way to be consistent in

14   this case is, you have to two different counsel, just rule

15   against Mr. Lehr on both counts.

16             THE COURT:  Okay.  Well, that's a theory.

17             All right.

18             So tell me about --

19             MR. RIOPELLE:  Ongoing royalty?

20             THE COURT:  Yes.

21             MR. RIOPELLE:  Okay.  So I think your question was

22   exactly right is, what did the jury understand it was doing?

23   What did the jury understand the award of damages was for?

24             And, so, what we need to look at is, well, we need is

25   the evidence presented to the jury, what were the jury

1    instructions, and in this case, the evidence in the jury

2    instructions shows for use of the invention with no limit in

3    time.

4         And what Comcast is trying to do now is, they're trying

5    to overcome a failure of proof, and they are asking for the

6    mediation, because they put on no proof of a running royalty,

7    and they're trying to -- and they put on no proof of the time

8    limit, and, so, they're hoping they can get, in effect, a double

9    recovery, because of that failure of proof.

10        So let me go through this.  Let's look at the evidence

11   first.

12        Now, I don't think there is any question that Comcast

13   has the burden of proof on damages in the case, but Ms. Mulhern

14   -- and they concede this -- Ms. Mulhern put on no evidence that

15   the damages were only to the time of trial.  None.  She did not

16   put that on.

17        She also put on -- and there was no evidence of a

18   discount on the lump sum amount, because the term was set at

19   trial -- and Ms. Mulhern adopted a lump sum royalty, not a

20   running royalty.  If --

21        THE COURT:  Hold on just a second.

22        The '008 patent, that's the $15 million one, right?

23        MR. RIOPELLE:  That's correct.

24        THE COURT:  That issued in 2012?

25        MR. RIOPELLE:  That's correct.

1          THE COURT:  So, does it continue to run for the -- I

2     don't know -- to 2029 or something?

3          MR. RIOPELLE:  I don't know that ballpark.

4          I would say that I know in the pretrial report that the

5     parties filed, the expiration dates are in there.

6          THE COURT:  Okay.

7          MR. FINKELSON:  I believe it's actually 2016, your

8     Honor, or 2017, but Mr. Fenwick may know.

9          MR. FENWICK:  Your Honor, I believe for '008 it's some

10    time in 2017, and the other two are 2016, and 2018.  They're

11    three different dates.

12         THE COURT:  All right.  Is there a terminal disclaimer

13    of why -- okay.  All right.

14         MR. FENWICK:  There is an elaborate prosecution history

15    why the three have three different dates.

16         THE COURT:  Okay, okay.  I was --

17         MR. FENWICK:  It's not running out 17 years or, you

18    know, or 20 years from 2012, or anything like that.

19         THE COURT:  Thank you.  That's helpful.

20         All right.  Go ahead, Mr. Riopelle.

21         MR. RIOPELLE:  Again, there's no evidence in the record

22    of a running royalty, no testimony about a running royalty, and

23    the Federal Circuit in the Lucent case -- and I won't go into it

24    all that now here -- has a long explanation of the difference

25    between lump sum amounts, and running royalties, and what the

1    differences are.

2            And it goes exactly to what your point is.  The lump

3    sum is normally for an amount for use of the invention until the

4    patent expires.

5            THE COURT:  Well, and, in fact -- and I'm just thinking

6    -- I mean, aren't almost always the lump sums going to be

7    divided -- decided based on comparables?  In other words, patent

8    licenses issued hopefully on the patent-in-suit, or at least

9    some similar technology?

10           MR. RIOPELLE:  Right, exactly, and that was actually my

11   next point.

12           Ms. Mulhern based -- started her analysis, at least at

13   trial, started her analysis based on a lump sum payment by

14   Comcast to Hewlitt-Packard for 2-1/2 million.  In effect, used

15   that as the template.  And that's the template that was

16   presented to the jury that Comcast bought the rights to this

17   until those patents no longer existed.  That's what the jury

18   heard.

19           And, so, that template is what was -- she based it on

20   with a lump sum going until when the patents expired.  That's

21   the evidence that the jury was presented.

22           So now we have to figure out what was the jury

23   instructed?

24           And the jury instructions, which are Docket Entry 332,

25   there is no instruction that the damages were limited in time.

1         Instruction 2.2 charged the jury to quote, "Decide the

2    amount of damages adequate to compensate Comcast for

3    infringement."

4         That's all it says.

5         Instruction 4.1 says, "The damages are for the use of

6    the invention."

7         Nowhere in the jury instructions is the jury told that

8    the damages are for a limited period of time.

9         What's the other thing the jury was told?

10        The jury got this jury verdict form, which is in the

11   record at Docket No. 335.

12        What were they asked?

13        "What is the amount of damages you have determined for

14   infringement?"

15        Again, no time limitations.

16        So the logical inference here is the jury awarded

17   Comcast a lump sum for Sprint's use of the invention with no

18   limits.  There was no time limitation, they didn't put in any

19   evidence, they didn't ask for it in the jury instruction, it

20   wasn't in the jury instructions, there was no objection to the

21   jury instructions, it wasn't in the jury verdict form, and there

22   was no objection to the jury verdict form.

23        We don't know if the jury would have awarded less if

24   they had known that it was only for a limited period of time.

25   We just don't know.

1          Because Comcast failed to limit it, Comcast had the

2     burden of proof, and they now can't come in and try to undermine

3     the verdict and seek a double recovery.

4          THE COURT:  So, one of the things that Mr. Fenwick said

5     -- and maybe you addressed it, and maybe you didn't, I'm not

6     positive if you did, humor me and address it again -- when Dr.

7     Aron was being asked questions, did she say, no, this is the

8     number to the time of trial?

9          MR. RIOPELLE:  Dr. Aron, they did -- they did try to

10    clean up.  They realized by the time they got to Dr. Aron that

11    they had not put on any evidence of this, and they want did

12    attempt to clear it up with using Dr. Aron on cross-examination.

13         So Mr. Fenwick asked her on cross-examination about,

14    don't you agree this analysis goes through the time of trial?

15         Dr. Aron, if you go look at Pages 1108 and 1109 of the

16    transcript, you should go read this.  It is clear that she is

17    talking about what the experts said in their expert reports.

18         She's not talking about what effect -- she couldn't

19    have been talking about what Ms. Mulhern had said at trial,

20    because Ms. Mulhern didn't say anything about it at trial.

21         THE COURT:  Okay.  I understand what you're saying.

22         And, so, the question I asked Mr. Fenwick, you know,

23    what exactly is the framework for what you're -- what they're

24    asking me to do here?  Am I trying to figure out what the jury

25    most likely thought they were doing, or am I trying to figure

1    out something else?

2         MR. RIOPELLE:  I heard your question to Mr. Fenwick.  I

3    will confess that I have not -- I did not do a -- I did not

4    prepare to do research there, what is the standard of review for

5    this.

6         I believe -- and I agree with Mr. Fenwick on this --

7    is that we're trying to determine what the jury's conclusion

8    was, based on the evidence that was given to them, what the jury

9    instructions were, what the jury's evidence was.

10         I note that in some of the cases that both sides have

11    cited in the briefs, that they focused on the evidence, but they

12    also focused on the jury instructions, which is one of the

13    reasons I brought up the jury instructions here.

14         And, so, I think it's -- I think you are trying to

15    determine there is case law, there are cases that talk about

16    what to do with a vague verdict.  I don't recall what the

17    standard for review was, your Honor, but I believe it's --

18    you're trying to figure out what was the jury most likely

19    determining.

20         THE COURT:  And, essentially, I'm trying to do this

21    from the point of view of, there's a request for supplemental

22    relief, and I'm trying to figure out whether the jury has

23    preempted that?

24         MR. RIOPELLE:  I believe so.  I mean, I believe the

25    jury -- the jury understood that, because they had no

1    instruction otherwise.  And the evidence that they saw was

2    actually for the template of that -- of the Comcast agreement

3    was for the life the patents, is that they believe, okay, this

4    is what -- this is what we have to award Comcast for Sprint's --

5    and, again, I say use of the invention, because that is what was

6    in the jury instructions.  And that's what they understood, I'm

7    sure, what that was for.

8              THE COURT:  If you know, in the 10/13 case where Sprint

9    got a lump sum verdict, did this issue come up there, too?

10             MR. RIOPELLE:  I honestly don't know.  I don't know.

11             THE COURT:  Do you all know?

12             If you don't, you don't.

13             MR. FENWICK:  Not off the top of my head, Judge.

14             THE COURT:  Okay.  All right.

15             All right.  Okay.

16             Thank you, Mr. Riopelle.

17             Do you have anything to say in rebuttal, Mr. Fenwick?

18             MR. FENWICK:  I do, your Honor, and I'm reminded that

19    it's not going to come up, the issue in the other case, because

20    the patents have expired.  That's off the table.

21             First, it pains me to hear Mr. Riopelle accuse us of

22    being inconsistent as between the two cases, because we, in

23    fact, went to some pains to be consistent, and that's why we

24    took into account the time value and money issue, which Dr. Aron

25    is actually the person who first raised that issue, and after we

1      had filed our brief in this matter.

2              So we went through great pains to be consistent and --

3              THE COURT:  Yes, don't worry about that.

4              MR. FENWICK:  With respect to going back to the day of

5      the hypothetical negotiation, the situation in the two cases are

6      very different, because the date of the hypothetical negotiation

7      in this case is within the limitations period.  In the other

8      case, it's long before the limitations period.  There is no

9      inconsistency there.

10             Again, with respect to the fact that accused products

11     issued after the hypothetical negotiation here, and the accused

12     patents are issued after the hypothetical negotiation, some of

13     them, that's all baked into the hypothetical negotiation,

14     because the negotiators know that.

15             And to the extent that there's only infringement of the

16     '008 patent from 2012 forward, that's part of the hypothetical

17     negotiation, so that's already discounted.

18             When I addressed the expiration of those patents, out

19     of caution I meant to be careful.  The expiration period here is

20     in the next few years.  I don't want to be so specific as to

21     which years for which patents.

22             THE COURT:  Understood.

23             MR. FENWICK:  But they're certainly not many years out.

24             With respect to -- I sort of heard Mr. Riopelle to be

25     suggesting that, generally with a lump sum verdict, you're going

1      to be talking about through expiration of the patents.

2            And I don't think that's consistent with the cases.  I

3      think we've cited to you in the briefing cases finding that

4      where there is ambiguity in the verdict on the point of whether

5      the lump sum goes up to trial, or beyond trial to the expiration

6      of the patents, that that's to be resolved in favor of the

7      trial.

8            The jury was told in the opening statement that the

9      issue -- that they were going to be asked to award 16.5 million

10     for past damages.

11           With respect to Dr. Aron's testimony at 1108 and 1109

12     in --

13           THE COURT:  You know, past damages, if you are talking

14     about a hypothetical negotiation for a lump sum 2006, that's

15     past damages whether it's up to the time of trial, or up till

16     the end of the patents, isn't it?

17           MR. FENWICK:  I think if you are addressing

18     infringement beyond the time of trial, I don't think you're

19     talking about past damages, I think you're talking about --

20           THE COURT:  Because it all depends on what you were

21     talking about the hypothetical negotiation was for.  If it was

22     for -- I don't know -- at least right now, as I'm sitting here,

23     it seems kind of circular.

24           MR. FENWICK:  I don't think -- I don't think I see it

25     that way, your Honor.  It's damages for past infringements, past

1   damages, and that's what they were told.  The jury was told we

2   wanted the 16.5 million for.

3        And I do think it makes sense for your Honor to go back

4   and look at the testimony at 1108 and 1109 by Dr. Aron, because

5   that wasn't a quick fly-by that we did.  We lingered on that

6   point, and we, essentially, asked it of her a few different

7   ways.  And she was very clear that was her analysis, and Ms.

8   Mulhern's analysis, and that was the right premise for the

9   damages analysis.

10        So I think the jury having heard that, should have

11   understood exactly what was at issue.

12        THE COURT:  And what did she say?

13        She said she understood Ms. Mulhern's testimony to be

14   limited to the time of trial, notwithstanding the fact that Ms.

15   Mulhern didn't say anything about it one way or the other?

16        MR. FENWICK:  I can put it up there --

17        THE COURT:  Okay.  Let me see it.

18        MR. FENWICK:  -- so you can see it.

19        She is asked:

20        "In the analysis that you both you and Ms. Mulhern have

21   done, do you understand it's directed to a lump sum royalty

22   through the time of trial, correct?

23        "Answer:  That's what it should be, yes.

24        "And you and she agreed on that pointed, correct?

25        "I think we agreed on that point."

1          And then:  "And you accepted that principle" -- I'm

2   continuing to the next question -- "And you accepted that

3   principle for purposes of your analysis, isn't that right?

4          "I did."

5          THE COURT:  Hold on a second.

6          (Pause)

7          MR. FENWICK:  She does say --

8          THE COURT:  So she says, I didn't see any steps by

9   which the end date as the date of the trial was accounted for in

10  her analysis.

11         MR. FENWICK:  You're right.  She indicated that that

12  was the right comparable to apply.

13         THE COURT:  Well, that sort of cuts both ways, doesn't

14  it?

15         MR. FENWICK:  I think that she's criticizing Dr.

16  Mulhern's analysis there, but she's not challenging what the

17  premise was.  She agreeing that the premise is -- it's a lump

18  sum through the time of trial.

19         She didn't suggest that maybe it should have been done

20  a different way in terms of the analysis, but what the -- the

21  message to the jury is about the what the issue is, is quite

22  clear.

23         THE COURT:  One of the things that I'm curious about is

24  why -- I mean I can guess at an answer here, but I would be

25  interested in your opinion -- why for a lump sum would the

1    experts calculate it, quote, "to the time of trial"?  Why not,

2    when you're basing it on comparable patent licenses, why not

3    calculate it along the same -- why not calculate it just as a

4    lump sum for a paid up license?

5           MR. FENWICK:  Your Honor, I think -- you are right that

6    where folks are seeking a lump sum.  They are often going to

7    point to commercial lump sum licenses that are for the life of

8    the patents, but in the course of the case, the issue at hand is

9    damages for past infringement.

10          And, so, the reason you would seek a lump sum to time

11   of trial, I think is to avoid getting into the position of

12   asking for damages for future infringement, which is primarily a

13   post-trial issue, what's the ongoing royalty going to be, which

14   takes into account different factors.

15          It's a different analysis than what was behind the

16   hypothetical negotiation in 2006, so it doesn't follow, you

17   know, as night follows day, that the royalty rates -- that if

18   you have a running royalty that the royalty rate you grant as a

19   post-judgment matter is going to be the same as the royalty you

20   would have granted as a -- based on the hypothetical negotiation

21   in a trial.

22          They're two different issues.

23          THE COURT:  Okay.  That seems reasonable.

24          Anything else, Mr. Fenwick?

25          MR. FENWICK:  I don't believe so, your Honor.

1           THE COURT:  All right.

2           Did we get through all the topics or do we have more to

3      go?

4           MR. LEHR:  I think we got through all the topics, your

5      Honor.

6           THE COURT:  Okay.  All right.

7           I will take it under advisement.

8           Do you know, Mr. Lehr, when the briefing on the 11/13

9      case, or 11/03, or whatever it is, 10/13, when roughly that is

10     supposed to end?

11          MR. LEHR:  Shortly, your Honor.

12          MR. FENWICK:  May 15th, your Honor.

13          THE COURT:  And when that ends, is that case just as

14     well tolled up for this kind of argument as this case has been?

15          MR. LEHR:  Yes, your Honor.

16          THE COURT:  Is the length of the briefing in that case

17     roughly comparable to what the length of briefing in this case

18     has been?

19          MR. LEHR:  I believe so, your Honor.

20          THE COURT:  Okay.  All right.

21          Why -- is it Mister -- what's the name of counsel for

22     that?

23          MR. RIOPELLE:  Mr. Webb.

24          THE COURT:  Mr. Webb, right.

25          Why don't you see, Mr. Lehr, why don't you get in touch

1    with Mr. Webb and see if you can't figure out a date some time

2    after June 1st to schedule an argument on that case, because I

3    tend to think that I'd like to have that case in mind while I'm

4    working through the issues on this case, so it would be good to

5    catch that case up.

6              MR. LEHR:  Sure, your Honor.

7              THE COURT:  Anything else?

8              MR. RIOPELLE:  No, your Honor.

9              MR. LEHR:  No, thank you, your Honor.

10             THE COURT:  All right.

11             Well, thank you all for your time and attention to

12   this.

13             And, you know, if I do what I just said, don't expect

14   an opinion next week, okay?

15             MR. LEHR:  Right.

16             MR. RIOPELLE:  Thank you, your Honor.

17             THE COURT:  All right.

18             We'll be in recess.  Thank you very much.

19             (The proceedings adjourned at 2:24 o'clock p.m.)

20                           *  *  *  *  *

21

22

23

24

25