# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF DELAWARE

COMCAST IP HOLDINGS I, LLC,

        Plaintiff,

v.

SPRINT COMMUNICATIONS COMPANY    No. 12-cv-0205-RGA
L.P, SPRINT SPECTRUM L.P.; and
NEXTEL OPERATIONS, INC.,

        Defendants.

## Memorandum Opinion

Matthew Lehr, Esq. (argued), Davis Polk & Wardwell, LLP, Menlo Park, CA; Anthony
Fenwick, Esq. (argued), Davis Polk & Wardwell LLP, Menlo Park, CA; Arthur G. Connolly, III,
Connolly Gallagher LLP, Wilmington, DE; for the Plaintiff.

Brian C. Riopelle, Esq. (argued), McGuire Woods, Richmond, VA; David E. Finkelson, Esq.
(argued), McGuire Woods, Richmond, VA; Rachelle H. Thompson, Esq. (argued), McGuire
Woods, Raleigh, NC; Richard Herrmann, Morris James LLP, Wilmington, DE; for the
Defendants.

August 10, 2015

**ANDREWS, UNITED STATES DISTRICT JUDGE:**

Before this Court is Defendants' combined Motion for Judgment as a Matter of Law and Motion for New Trial. (D.I. 352). It has been fully briefed. (D.I. 353, 362, 368). Plaintiff has also moved for post-trial relief (D.I. 355), and that motion is also fully briefed. (D.I. 356, 360, 367). In connection with its request for post-trial relief, Plaintiff has also submitted a letter amending its claimed prejudgment interest. (D.I. 374). The Court has heard oral argument on these post-trial matters. (D.I. 375).

After a 6-day jury trial in October 2014, judgment was entered for Plaintiff against Defendants consistent with the jury's verdict for infringing claim 45 of U.S. Patent No. 7,012,916 ("'916 patent"), claims 90 and 113 of U.S. Patent No. 8,204,046 ("'046 patent"), and claims 1, 13, and 27 of U.S. Patent No. 8,170,008 ("'008 patent"). (D.I. 351). Damages were awarded to Plaintiff for $7.5 million. *Id.* At the close of Plaintiff's case-in-chief, Defendants moved for judgment as a matter of law on non-infringement of the asserted patents as well as damages. (D.I. 329 at 115-16). Defendants renewed this motion after the close of evidence, which the Court denied. (D.I. 330 at 139-41).

The patents at issue broadly relate to using internet technology to route calls through a network. (D.I. 328 at 230). Both parties are in agreement about what call flows are accused of infringement. (D.I. 353 at p. 7; D.I. 362 at pp. 4-5). Comcast contended that Sprint infringed its patents-in-suit when providing telephony service to subscribers using (1) Sprint Mobile Integration ("SMI"), (2) Google Voice, or (3) Sprint's Airave 2 device. (D.I. 332 at 15). For the '008 patent's asserted claims, Comcast accused three call flows of infringing: (1) when an SMI subscriber on a CDMA mobile handset makes a call to any party except for a Sprint subscriber that is not an SMI or Google Voice user, (2) when a Google Voice subscriber makes a call to any

party except for a Sprint subscriber that is not an SMI user, and (3) when a Sprint subscriber on

Sprint's CDMA network makes a call to a user of an Airave 2 device.  (D.I. 335 at 3).  Comcast

also alleged that three call flows infringed the asserted claims of both the '916 and '046 patents:

(1) when an SMI subscriber on a CDMA mobile handset makes a call to another SMI subscriber

or a Google Voice subscriber, (2) when a Google Voice subscriber makes a call to an SMI

subscriber, and (3) when a Sprint subscriber using an Airave 2 device makes a call to an SMI

subscriber or a Google Voice subscriber.  (D.I. 335 at 2).

For the following reasons, Sprint's Renewed Motion for Judgment as a Matter of Law

and Motion for a New Trial (D.I. 352) is **DENIED**, and Comcast's motion for post-trial relief

(D.I. 355) is **GRANTED**.

## I. LEGAL STANDARD

### A. JMOL

Judgment as a matter of law is appropriate if "the court finds that a reasonable jury would

not have a legally sufficient evidentiary basis to find for [a] party" on an issue.  Fed. R. Civ. P.

50(a)(1).  "Entry of judgment as a matter of law is a 'sparingly' invoked remedy, 'granted only

if, viewing the evidence in the light most favorable to the nonmovant and giving it the advantage

of every fair and reasonable inference, there is insufficient evidence from which a jury

reasonably could find liability.'"  *Marra v. Phila. Hous. Auth.*, 497 F.3d 286, 300 (3d Cir. 2007)

(citation omitted).

"To prevail on a renewed motion for JMOL following a jury trial, a party must show that

the jury's findings, presumed or express, are not supported by substantial evidence or, if they

were, that the legal conclusion(s) implied [by] the jury's verdict cannot in law be supported by

those findings." *Pannu v. Iolab Corp.*, 155 F.3d 1344, 1348 (Fed. Cir. 1998) (alterations in

original).  "'Substantial' evidence is such relevant evidence from the record taken as a whole as

3

might be accepted by a reasonable mind as adequate to support the finding under review." *Perkin-Elmer Corp. v. Computervision Corp.*, 732 F.2d 888, 893 (Fed. Cir. 1984).

In assessing the sufficiency of the evidence, the Court must give the non-moving party, "as [the] verdict winner, the benefit of all logical inferences that could be drawn from the evidence presented, resolve all conflicts in the evidence in his favor and, in general, view the record in the light most favorable to him." *Williamson v. Consol. Rail Corp.*, 926 F.2d 1344, 1348 (3d Cir. 1991). The Court may "not determine the credibility of the witnesses [nor] substitute its choice for that of the jury between conflicting elements in the evidence." *Perkin-Elmer*, 732 F.2d at 893. Rather, the Court must determine whether the evidence supports the jury's verdict. *See Dawn Equip. Co. v. Ky. Farms Inc.*, 140 F.3d 1009, 1014 (Fed. Cir. 1998); *Gomez v. Allegheny Health Servs. Inc.*, 71 F.3d 1079, 1083 (3d Cir. 1995) (describing standard as "whether there is evidence upon which a reasonable jury could properly have found its verdict"); 9B *Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure* § 2524 (3d ed. 2008) ("The question is not whether there is literally no evidence supporting the party against whom the motion is directed but whether there is evidence upon which the jury might reasonably find a verdict for that party.").

### B. MOTION FOR A NEW TRIAL

Federal Rule of Civil Procedure 59(a)(1)(A) provides, in pertinent part: "The court may, on motion, grant a new trial on all or some of the issues—and to any party— . . . after a jury trial, for any reason for which a new trial has heretofore been granted in an action at law in federal court . . . ." Among the most common reasons for granting a new trial are: (1) the jury's verdict is against the clear weight of the evidence, and a new trial must be granted to prevent a miscarriage of justice; (2) newly discovered evidence exists that would likely alter the outcome

4

of the trial; (3) improper conduct by an attorney or the court unfairly influenced the verdict; or

(4) the jury's verdict was facially inconsistent. *See Zarow-Smith v. N.J. Transit Rail Operations,*

*Inc.*, 953 F. Supp. 581, 584–85 (D.N.J. 1997).

The decision to grant or deny a new trial is committed to the sound discretion of the

district court. *See Allied Chem. Corp. v. Daiflon, Inc.*, 449 U.S. 33, 36 (1980); *Olefins Trading,*

*Inc. v. Han Yang Chem. Corp.*, 9 F.3d 282, 289 (3d Cir.1993) (reviewing district court's grant or

denial of new trial motion under the "abuse of discretion" standard).  Although the standard for

granting a new trial is less rigorous than the standard for granting judgment as a matter of law—

in that the Court need not view the evidence in the light most favorable to the verdict winner—a

new trial should only be granted where "a miscarriage of justice would result if the verdict were

to stand," the verdict "cries out to be overturned," or where the verdict "shocks [the]

conscience." *Williamson*, 926 F.2d at 1352–53.

## II. DISCUSSION

### A. Judgment as a Matter of Law or New Trial

#### 1. Jury verdict on the '008 patent

At trial, sufficient evidence was offered for a jury to determine that the accused call flows

infringed the asserted claims of the '008 patent, and thus, this Court will not grant judgment as a

matter of law or a new trial on these grounds.  Defendants argue that the jury's verdict rendered

three terms in the three asserted claims of the '008 patent superfluous, "call destination,"

"identifier of a second party," and "second party." (D.I. 353 at p. 12).  These terms were not

previously construed by this Court, so the jury was charged with applying their "common

meaning." (D.I. 332 at 18).[1]

> Claim 1 reads:
>
> A method, comprising: receiving, over a switched telecommunication system, a request; determining, responsive to the request, *a call destination* using domain name system signaling; and initiating a call through the switched telecommunication system between a calling party and *the call destination* that was determined as a result of said domain name system signaling.

('008 patent, claim 1) (emphasis added).

> Claim 13 reads:
>
> A method, comprising: receiving, over a switched telecommunication system, an indication of a called party; determining, responsive to the indication of the called party, *a call destination* associated with the called party using domain name system signaling; and initiating a call through the switched telecommunication system between a calling party and *the call destination* that was determined as a result of said domain name system signaling.

('008 patent, claim 13) (emphasis added).

> Claim 27 reads:
>
> A method, comprising: receiving a request from a first party; determining by a computer, responsive to the request, *an identifier of a second party* using domain name system signaling; setting up a call through the switched telecommunication system between the first party *and the second party* that was determined as a result of said domain name system signaling.

('008 patent, claim 27) (emphasis added).

There was substantial evidence to support the jury's determination that Sprint's accused

call flows met the call destination limitation. Sprint argues that Comcast eviscerated the

meaning of "call destination" by implying through its expert, Dr. Eric Burger, that a call

---

[1] The Court construed about ten disputed terms, and the parties reached agreement on a number of other constructions. (D.I. 138). No one requested that the Court construe the terms in the '008 patent now at issue. (D.I. 69).

destination is "the place that Sprint routes calls to." (D.I. 353 at p. 13; *see* D.I. 328 at 357-58 ("Q. And it is your opinion in this case that the call destination that is required by claims 1 and 13 of the '008 patent is something other than the receiving phone; is that correct?  A. That's correct. …Actually, it's the place that Sprint routes the call to.")).  Thus, Sprint argues it was improper that Comcast's attorney then summarized this position in closing, arguing that a call destination is "any destination along the way in route of a call" and can be "multiple destinations." (D.I. 353 at p. 13; D.I. 333 at 46-49).  It seems that Sprint wants a call destination to mean the absolute final point in the call flow, or the receiving phone.  But a jury could reasonably conclude that there are intermediate "call destinations" before the phone receives the call, or even several "call destinations," especially relying on the testimony of Dr. Burger at trial. (*See* D.I. 328 at 357-58).  Further, Sprint had an opportunity to cross-examine Dr. Burger, and attack his credibility, which Sprint did. (D.I. 328 at 358 ("Q. …A call destination, in your view, is the final point in a particular service provider's network to which a call is routed; is that correct?  A. Well, I think sometimes I may have misspoke, but it's where Sprint routes the call.")).  It was the jury's role to weigh the credibility of Dr. Burger's testimony and to accept it if persuasive.  To accept his testimony does not mean the term was read out of the claims; not every point along the route of a call is a call destination.  Beyond relying on Dr. Burger's testimony, a jury could reasonably look at the claims and conclude that the word "a" before the first use of the term call destination implied that there could be more than one destination, and that the "the" before the second use of the term call destination was the final point in reference to where the calls were routed by Sprint's networks performing the patented method. (*See* '008 patent, claims 1, 13).

Similarly, the jury's verdict did not render the terms "identifier of a second party" and "second party" superfluous in claim 27 of the '008 patent, as Defendants argue. (D.I. 353 at p. 15). Defendants appear to argue essentially that the second party cannot be a third party service provider or an Airave 2 device but must be a dialed party's handset. (D.I. 353 at pp. 15-16). Dr. Burger explained that DNS (domain name system) signaling determines an "identifier of a second party," which could be, for example, the MAC (media access control) address of an Airave II device (D.I. 328 at 252) or an SBC (session border controller) (D.I. 328 at 258), which interfaces between Sprint's network and other networks. (D.I. 328 at 125-26). Sprint cross-examined Dr. Burger about allegedly dropping a requirement that the "identifier of a second party" must "uniquely" identify a second party. (*See, e.g.,* D.I. 328 at 356 ("Q. If the IP address and port of the SBC or [MGC] [media gateway controller] are not in fact unique to any particular carrier or service provider, then you would agree that the SBC and [MGC] do not identify a second party for purposes of claim 27; is that correct? A. No. They still identify the second party. It's how you get to the second party.")). A jury could reasonably rely on Dr. Burger's testimony and find him credible, rejecting the weight of this cross-examination.

Sprint makes broader arguments about how a call cannot exist between a mobile handset and a device such as an Airave 2, SBC and MGC. (D.I. 353 at p. 16). The crux of Defendants' argument is that, because one cannot "talk" to these devices, a "call" as determined by the claims cannot be set up. (D.I. 353 at p. 16). This is a spurious argument. In the context of routing calls through networks, it is unclear why "talking" is a requirement of a "call." Plaintiff rightfully points out that "nothing in the claims requires that a calling party be able to 'talk to' the call destination or the 'second party.'" (D.I. 362 at p. 16). The jury was free to use an ordinary meaning of call that did not require "talking to" the other party. Therefore this argument fails.

8

Sprint wrongly relies upon Dr. Burger's testimony to demonstrate that the jury verdict is incorrect as a matter of law when considering Dr. Burger's testimony about non-accused call flows. (D.I. 353 at pp. 17-18). As a general proposition, it seems challenging to draw too much from the call flows that Dr. Burger carved out from his infringement examples. (D.I. 328 at 362-63 ("Q. … You specifically identified them as an exception to your infringing use cases? A. In my summary table, that's correct. Q. You agree they don't infringe? A. I -- I have not given an opinion, so… Q. You have not opined that they infringe; is that correct? A. That's correct.")). Plaintiff says that Dr. Burger agreed that these call flows were exceptions to his infringing call flows, but that only means that they were not call flows he "affirmatively concluded" infringe. (D.I. 362 at p. 17). It seems clear that Dr. Burger did not explicitly determine that they do not infringe. (*See* D.I. 328 at 362 ("Q. And that's because you agree that a call from an SMI or Google Voice CDMA handset to a Sprint subscriber does not infringe the Comcast patents that are at issue in this case; is that correct? A. Actually, I can't remember whether I did that as a determination. I didn't determine that they did infringe. Q. In fact, you specifically identified them as an exception -- A. As an exception.")).

Sprint wants to read these examples as demonstrating that, because the MGC and SBC are not destinations in these exceptions, they cannot be destinations in the infringing examples. Considering how tentative Dr. Burger was with his non-infringing examples, this is not a reasonable position. In its reply brief, Sprint says that Dr. Burger carved out the unaccused call flows as non-infringing exceptions and that he "specifically explained why they do not infringe," citing a statement from the transcript, "because after routing to the MGC, it continues to another point in Sprint's network for further routing." (D.I. 368 at p. 11). That statement, however, is not Dr. Burger "specifically explain[ing]" the non-infringing exceptions, but a quote from

9

Sprint's counsel's question, with which Dr. Burger agreed. (D.I. 328 at 363 ("Q. In fact, you specifically singled them out as not infringing, as being exceptions to your infringing use case? A. That's right.  Q. You agree that a call from an SMI caller to a regular Sprint subscriber, a Sprint CDMA subscriber, does not infringe the '008 patent because after routing to the MCG, it continues on to another point in Sprint's network for further routing; is that correct?  A. That's correct.")).  Assuming that this could be characterized as inconsistent with his other testimony, it does not follow that there is not substantial evidence to support the jury's finding that the accused call flows met the call destination limitation.  Furthermore, the relevance of Dr. Burger's exceptions is limited because of how tempered Dr. Burger was about why he had not determined that they were infringing.

Finally, Sprint argues that the call destination where a Sprint subscriber on Sprint's CDMA network makes a call to a user of an Airave 2 device does not use domain name system signaling, as required by the claims. (D.I. 353 at pp. 18-19).  Sprint essentially argues that the domain name system signaling process only determines the location of a convergence server, not the Airave 2 device. (D.I. 353 at p. 19).  But Plaintiff reasonably argues that the MAC address of the Airave 2 device is determined by a process that includes domain name system signaling. (D.I. 362 at p. 18; *see also* D.I. 328 at 115-16).  It seems reasonable that a jury could conclude from this evidence that this call flow satisfies the requirement of using domain name system signaling.

## 2. Jury verdict on the '916 and '046 patents

At trial, sufficient evidence was offered for a jury to determine that the accused call flows infringed the asserted claims of the '916 and '046 patent.  Therefore this Court will not grant judgment as a matter of law or a new trial on these grounds.  Defendants argue that there is no

legally sufficient evidence to support a jury verdict that satisfied the "parsing" limitation of the claims. (D.I. 353 at pp. 19-22). This Court construed "parsing" as "[a]n automated process of analyzing a string according to a set of rules of a grammar." (D.I. 298 at 3).

Claim 45 of the '916 patent reads:

A method of accessing communications data for contacting a target entity, said method comprising: forming, from a number string identifying the target entity, a domain name by a process including *parsing* at least a substantial portion of the number string into at least a part of said domain name; supplying the domain name formed to a DNS-type database system and receiving back a resource record including an URI for locating communications data associated with the domain name; and using the URI received back to access said communications data.

('916 patent, claim 45) (emphasis added).

Claim 90 of the '046 patent reads:

A method, comprising: forming, by at least one computing device, from a number string identifying a target entity, a domain name by a process including *parsing* at least a portion of the number string into at least a part of said domain name; and supplying, by the at least one computing device, the domain name to a database and receiving back from that database a resource record including a uniform resource identifier (URI) of the target entity.

('046 patent, claim 90) (emphasis added).

Claim 113 of the '046 patent reads:

A method, comprising: forming, by at least one computing device, from a number string identifying a target entity, a domain name by a process including *parsing* at least a portion of the number string into at least a part of said domain name; supplying, by the at least one computing device, the domain name to a database and receiving back from that database a resource record including a uniform resource identifier (URI) of the target entity; and sending a message to the target entity identified using the URI.

('046 patent, claim 113) (emphasis added).

As the Court has said previously, there is sufficient evidence to find that the "parsing" limitation has been met, particularly when considering Dr. Burger's testimony. (*See* D.I. 329 at 121 ("So, on the parsing, I'm going to deny the JMOL, and you know, I think Dr. Burger

touched the basis and I think there's enough analysis there, so that [if] the jury finds for him, for

Comcast, that will be supported by substantial evidence.")). Dr. Burger provided extensive

detailed testimony about how "parsing" occurred:

> ...So the judge in a Claim Construction Order said that parsing is an automated process of analyzing a string according to a set of rules of a grammar. And in this situation, you see Sprint and, in fact, Mr. Nehme talked about it, and Mr. Riopelle talked about it yesterday about how Sprint analyzes a string.
>
> And you have to understand in computer science, you know, when you think of analyzing, you're thinking of, you know, what people do, but we're talking about computers here. In computer science terms, a string is just any set of characters.
>
> It could be text. But in this case, it happens to be numbers. And it's a set of rules of a grammar. A grammar in computer science is not [like] English with nouns, verbs and subjects. A grammar is just when you have a set of tokens or just a bit of strings, what's the relationship between the tokens?
>
> In Sprint's case, and as Mr. Nehme explained, how they do this step of parsing? They take all of the digits. That's the analyzing part.
>
> And in the relationship between them is put them in the opposite order, put in the dots and then the E164.ARPU.

(D.I. 328 at 261-62).

Defendants had an opportunity to cross-examine Dr. Burger on this testimony, and they

argue Dr. Burger gave the opposite testimony on the very same steps. (D.I. 353 at p. 20). But, in

the testimony cited, Defendants tried to discredit Dr. Burger by pinning him down on which step

or steps he was asserting were parsing. (*See, e.g.*, D.I. 328 at 340 ("Q. And it's your testimony,

correct, Dr. Burger, that the first step is parsing; correct?  A. The validating the number, that's –

this is, you know, where it gets interesting because a number of these steps taken alone would be

parsing.  And putting them altogether is definitely parsing.  So it's hard to say: Is this step a

parsing step or that because it's all part of that analysis.")).  Even if Sprint's expert, Dr. M. Ray

Mercer, testified that parsing does not occur, the jury was free to weigh his testimony against Dr.

Burger's and the rest of the evidence. (*See, e.g.*, D.I. 329 at 242 ("Q. ... So your testimony is

that example right there is an example of what ENUM does; correct? A. Yes. Q. And your

testimony is that is not parsing? A. That's exactly right.")). There is sufficient evidence for the jury to have found that parsing occurred, and therefore the jury verdict cannot be disturbed.

### 3. The damages award

Defendants argue that the Court should vacate the damages award because Comcast's expert Carla Mulhern's methodology lacked sufficient analysis and evidentiary support. (D.I. 353 at pp. 22-24). Ms. Mulhern testified that Comcast is entitled to damages of $16.5 million for Sprint's infringement of all three patents. (D.I. 329 at 31). More specifically, she opined that Comcast was entitled to damages of $15 million for the '008 patent, $1 million for the '916 patent, and $500,000 for the '046 patent. (D.I. 329 at 31). The jury awarded damages of $7.5 million for all three patents. (D.I. 351).

Ms. Mulhern's analysis was not a "black box" as Defendants argue, nor did she provide "no explanation" for how she reached her figures. (D.I. 353 at pp. 22-23). Defendants argue that her figures were not based on any analysis except for certain *Georgia-Pacific* factors affecting her figures upwards or downwards. (D.I. 353 at pp. 22-23). Defendants argue that Ms. Mulhern's analysis was based only on her experience and was deficient because it did not use a mathematical formula. (D.I. 353 at p. 24). Defendants rely on *GPNE Corp. v. Apple, Inc.*, 2014 WL 1494247, at *5 (N.D. Cal. April 16, 2014), but in that case there was no methodology beyond the expert's "30 years of experience," no economic analysis, nor sufficient facts or data. Here, however, that is not the case. Ms. Mulhern started her analysis with a 2008 patent transaction that Comcast valued "north of $4 million," but for which Comcast ultimately paid $2.5 million. (D.I. 329 at 41-42). She then compared that agreement to a hypothetical negotiation, explaining that factors related to uncertainty at the time would lead to a substantial discount on the purchase price of the transaction. (D.I. 329 at 43-44). She opined that a

13

multiplier of more than three would be appropriate in this case. (D.I. 329 at 45). Then, using the *Georgia-Pacific* factors, Ms. Mulhern adjusted her figure to arrive at her opined damage award. (*See, e.g.,* D.I. 329 at 53-66).

Defendants are correct that Ms. Mulhern did not offer a mathematical formula for her result. (*See* D.I. 329 at 79 ("Q. You don't have any numerical calculations or arithmetic? You haven't done any analysis that gets you to, for example, the $16.5 million on the '008, no numerical calculation that gets you to the '008 damages, do you? A. I mean, I think if what you're asking is -- I can agree with you that there's no mathematical formula that gets me to that -- spits out the $16.5 million number. That's right. ")). That does not mean that her opinion was not based on a sound methodology. The hypothetical negotiation to determine a reasonable royalty can involve some approximation. *See LaserDynamics, Inc. v. Quanta Computer, Inc.*, 694 F.3d 51, 76 (Fed. Cir. 2012) ("The hypothetical negotiation ... necessarily involves an element of approximation and uncertainty.") (internal quotation marks omitted) (citations omitted). It was Defendants' option to raise the lack of a formula on cross-examination, as they did, and the jury was free to discount Ms. Mulhern's analysis, as it appears the jury did. The jury awarded $7.5 million, not $16.5 million. The lack of a mathematical formula, when there is other analysis, cannot, alone, be grounds for excluding Ms. Mulhern's methodology.

The jury was not limited to Ms. Mulhern's analysis and could have easily arrived at its $7.5 million verdict relying on Sprint's expert Dr. Debra Aron's testimony[2] or other evidence, something this Court noted at trial. (D.I. 330 at 140-41 ("... if the jury were to determine that Ms. Mulhern's analysis was not a sufficient basis to prove her theories by a preponderance of the

---

[2] Credibility is not for the Court. Nevertheless, I have now seen Dr. Aron testify in two trials, both times with a high degree of credibility.

evidence, I think the jury could come up with its own calculation of a reasonable royalty, and, in fact, I believe Dr. Aron pretty much invited them to do so, and so I don't think that's grounds for a JMOL.")).  It is strange that Defendants argue that there is no evidence for a damages verdict when their own expert explicitly invited the jury to rely on her testimony alone to determine damages.  (D.I. 330 at 71 ("I think that I have provided the jury with an anchor upon which to consider a reasonable royalty.  I have provided them, I hope, a way of understanding what a reasonable royalty is, and I've provided them, I think, a perspective on the evidence in the case that I would hope they would keep in mind and consider as to what a reasonable royalty would be if they were to decide that they should come up with one.")).  Indeed, Dr. Aron provided extensive analysis of how the 2008 patent transaction of $2.5 million could be used to determine an appropriate damages award.  (*See, e.g.*, D.I. 330 at 47-49).  In light of this testimony, it seems more than reasonable that a jury could, and probably did, rely on Dr. Aron's testimony alone to arrive at the $7.5 million verdict.

Sprint's arguments about excluding Comcast's expert Ms. Mulhern also fail.  As the Court explained at the hearing for these motions, it is my opinion that the time to bring a *Daubert*-type theory to exclude what is disclosed in the expert's reports and deposition is before trial.  (D.I. 375 at 53-54 ("You have a report that's written by Ms. Mulhern, it's got at least two theories in it, you move to exclude one, I grant it, then we go to trial, she testifies as to the [other] one, you cross-examine her on it, you have Dr. Aron point out some weaknesses.  And now, in essence, you're saying, oh, by the way, Judge, on Daubert she should be out.  It's kind of late.")).

Nor do I think Ms. Mulhern violated this Court's order preventing her from testifying on the "income approach" in violation of the entire market value rule.  (*See* D.I. 324 at 1-2).  "The

entire market value rule allows for the recovery of damages based on the value of an entire apparatus containing several features, when the feature patented constitutes the basis for customer demand." *Lucent Technologies, Inc. v. Gateway, Inc.*, 580 F.3d 1301, 1336 (Fed. Cir. 2009) (citations omitted) (internal quotation marks omitted). Sprint tries to demonstrate that Ms. Mulhern opined that the patented technology drove customer demand, but she said no such thing. (*See* D.I. 353 at pp. 26-27; *see, e.g.*, D.I. 329 at 81 ("Q. You agree, right, that feature has nothing to do with the patented technology at issue in this case; right? A. … the patents are necessary to complete calls in the SMI service generally, which is necessary for Sprint to be able to offer the service and that feature.")). Stating that patents are necessary to offer a service is not the same thing as making an income approach argument, where recovery would be based on the value of the entire service. Nor is it the same as saying that a specific feature drives customer demand. Ms. Mulhern also did not rely on revenues or lost profits. Therefore, Ms. Mulhern's testimony was not improper.

### 4. A new trial

Sprint moves for a new trial incorporating the same arguments it has already made about the weight of the evidence. (D.I. 353 at p. 27). For the same reasons mentioned above, this argument fails.

Sprint also argues that Comcast's experts, Dr. Burger and Ms. Mulhern, exceeded the scope of their expert reports. This argument fails. For Dr. Burger, Sprint argues that he identified one call flow as "when a Sprint subscriber on Sprint's CDMA network makes a call to a user of an Airave 2 device" but in his report this call flow ended at a "user" of an Airave 2 device, rather than the device itself. (D.I. 353 at p. 29; *see* D.I. 354 at 9). At trial, Dr. Burger did not say that the call flow ended at the device, even if he determined that was the call destination.

16

Dr. Burger stated that the call flow did not stop at the Airave 2 device but continued to the subscriber's device. (D.I. 328 at 243-244 ("Q. And why do you say that the Airave II device is a call destination? A. Because it's where the Sprint network routes the call to. Q. And after the call is routed by the Sprint network to the Airave II device, what happens next to that call? A. The subscriber, hopefully, the subscriber, you know, answers the call. It rings his phone and they get the call.")). This testimony did not exceed the scope of Dr. Burger's export report.

As for Ms. Mulhern's testimony, Sprint argues that she testified for the first time about aspects of Factor 6 of the *Georgia-Pacific* analysis, related to ancillary financial benefits of the accused products. (D.I. 353 at p. 30). According to Sprint, Ms. Mulhern opined on the "upward impact" on the royalty for these products because of the ancillary benefits. (D.I. 353 at p. 30; *see, e.g.*, D.I. 329 at 66 ("Factors 6 and 8, when we considered the benefit to Sprint of selling the accused – of the ability to [sell] accused products, suggests an upward impact on the royalty because it suggests that Sprint benefited in the ways that we've just been discussing through the ability to sell these accused products.")). Sprint says that Ms. Mulhern's report contains no explanation of these ancillary benefits absent the Income Approach, which this Court struck. (D.I. 324 at 2; D.I. 354 at 25-26). The Court agrees with Comcast that Ms. Mulhern did address the ancillary benefits in her report, separate from her Income Approach analysis. (D.I. 354 at 26 ("In this case, the provision of the accused products does, in fact, drive ancillary revenues and profits associated with other products and services.")). Therefore Ms. Mulhern's testimony did not exceed the scope of her expert report.

**B. POST-TRIAL RELIEF**

Comcast has separately moved for post-trial relief for (1) prejudgment interest, (2) postjudgment interest on the jury's $7.5 million damages award, and (3) an ongoing royalty for continued use of the patented technology. (D.I. 355 at 1). Initially Comcast sought prejudgment interest of $2,921,451, but Comcast later submitted a letter adjusting its request for prejudgment interest to $1,691,640, which corrected the earlier request to adjust the date that interest would begin accruing after the hypothetical negotiation. (D.I. 374). At the hearing, Sprint's counsel said there was no objection with the math but purely the underlying methodology. (D.I. 375 at 72). At the hearing, Sprint's counsel also indicated that post-judgment interest was not in dispute. (D.I. 375 at 71).

The parties basically disagree about whether prejudgment interest should be assessed from the time of the hypothetical negotiation in late 2006 (D.I. 356 at 10) or whether it should be calculated from the time of first infringement of each patent until judgment. (D.I. 360 at 14-15).

"As a rule, prejudgment interest should be awarded under 35 U.S.C. § 284 absent some justification for withholding such an award." *Whitserve, LLC v. Computer Packages, Inc.*, 694 F.3d 10, 36 (Fed. Cir. 2012) (citations omitted) (internal quotation marks omitted). "The rate of prejudgment interest and whether it should be compounded or uncompounded are matters left largely to the discretion of the district court. In exercising that discretion, however, the district court must be guided by the purpose of prejudgment interest, which is to ensure that the patent owner is placed in as good a position as he would have been had the infringer entered into a reasonable royalty agreement." *Bio-Rad Labs., Inc. v. Nicolet Instrument Corp.*, 807 F.2d 964, 969 (Fed. Cir. 1986) (citations omitted) (internal quotation marks omitted).

The Court agrees with Comcast that the measure of damages must be from the time of the hypothetical negotiation to trial for all the asserted patents. (*See* D.I. 356 at 12). Sprint points

out that two of the patents did not issue until several years after the hypothetical negotiation—the '916 patent issued in 2006, but the '046 and '008 patents issued only in 2012. (D.I. 360 at 8). Even so, both sides' experts opined that the reasonable royalty should be a lump sum resulting from a single hypothetical negotiation that took place in 2006. (*See, e.g.*, D.I. 330 at 82 ("Q. You agree with Ms. Mulhern that if the '916 patent or any combination of patents that includes the '916 is found to be infringed, then the appropriate date for the hypothetical negotiation for all infringed patents in this case is late 2006; correct? A. Yes, that's right.")). A hypothetical negotiation in 2006 would include each of the asserted patents, even if they issued later, and the resulting negotiation would include the fact that two of the patents issued later. *See ResQNet.com, Inc. v. Lansa, Inc.*, 594 F.3d 860, 872 (Fed. Cir. 2010) (for reasonable royalty calculations, a "district court may also consider the panoply of events and facts that occurred thereafter and that could not have been known to or predicted by the hypothesized negotiators.") (citations omitted) (internal quotation marks omitted). Further, as Comcast argues, this Court cannot reasonably infer from the jury's verdict what portion of the damages is attributed to each patent especially as the jury did not adopt Ms. Mulhern's proposed damage award. (D.I. 367 at pp. 3-4).

Sprint points out that Ms. Mulhern identified different first infringement dates for each of the three patents, but she did so only to explain how the hypothetical negotiation date would be pushed to a later date if the jury found that some, but not all three patents, were infringed. (D.I. 329 at 35-36 ("If Sprint is not found to have infringed the '916 patent, but only either the '046 or '008 patents, which issued much later, then the hypothetical negotiation would occur in 2012 at the time of first infringement of those patents.")). But the jury found that Sprint infringed all three patents, so the hypothetical negotiation date would be 2006. Sprint's new theory to

segment the damages by determining when each patent issued (and therefore when each patent was first infringed) is novel but not grounded in any evidence offered at trial.[3]

The Court agrees with Comcast that the appropriate interest rate is the prime rate, compounded quarterly. *See XpertUniverse, Inc. v. Cisco Sys., Inc.*, 2013 WL 6118447, at *11 (D. Del. Nov. 20, 2013) ("The Court has broad discretion to select the pre-judgment interest rate to be applied, and the Federal Circuit has held that application of the prime rate is appropriate even if there is no evidence that the patent holder borrowed at the prime rate.") (citations omitted).

Therefore, this Court will award Comcast the prejudgment interest of $1,691,640 it has requested.[4]

The parties indicated at the hearing that post-judgment interest was not in dispute (D.I. 375 at 71), and because this Court will grant Comcast's request for prejudgment interest, it will also grant post-judgment interest.

This Court also grants Comcast an ongoing royalty. "In most cases, where the district court determines that a permanent injunction is not warranted, the district court may wish to

---

[3] Would a hypothetical negotiation in 2006 for a patent not issued until 2012 result in an agreement to make a lump sum payment in 2006 or in 2012? If the payment were going to be in 2006, the licensor ought to get prejudgment interest. I would imagine that if two sophisticated parties made an arms-length agreement that one would pay the other a lump sum for some event that would certainly happen far into the future, they would negotiate some built-in adjustment to account for inflation. They are agreeing to pay the fair market value, and both parties would want the future payment to reflect the fair-market value at the time. Under either scenario, as applied to this case, an award of prejudgment interest is appropriate.

[4] The Court does not find that Comcast's supplemental letter changes the analysis. (D.I. 374). That is, even though Comcast adjusted the date interest would accrue from the hypothetical negotiation, Comcast still grounded its prejudgment interest analysis on the single hypothetical negotiation, which occurred in 2006, not multiple dates including 2012 when the '046 and '008 patents issued.

allow the parties to negotiate a license amongst themselves regarding future use of a patented

invention before imposing an ongoing royalty.  Should the parties fail to come to an agreement,

the district court could step in to assess a reasonable royalty in light of the ongoing

infringement." *Paice LLC v. Toyota Motor Corp.*, 504 F.3d 1293, 1315 (Fed. Cir. 2007).  Sprint

argues that Ms. Mulhern testified that the lump sum license she relied on was to provide

compensation for all infringement, and that she did not offer a time limit for her lump sum.  (D.I.

360 at 17).  Sprint also raises arguments about the deficiency of Ms. Mulhern's testimony, some

similar to arguments mentioned previously.  (D.I. 360 at 20).  The lump sum that the jury

awarded Comcast only extended through the date of trial, something the experts repeatedly

stated.  (*See, e.g.,* D.I. 330 at 82 ("Q. And the analysis that both you and Ms. Mulhern have done,

you understand is directed to a lump sum royalty through the time of trial; correct?  A. That's

what it should be, yes.")).  I do not understand why Sprint argues that the lump sum covered the

past, present, and future, when its own expert repeatedly testified that the lump sum only

extended to the date of the trial.  Comcast also points out that both experts agreed during

discovery that the lump sum was only calculated through trial.  (D.I. 356 at 8 n.1; *see also* D.I.

356-2 at 3 ("Q. Okay.  So would it be fair to say that you agree with Ms. Mulhern that the

appropriate form of damages in this case is a lump sum reasonable royalty calculated through

trial?  A. Yes.  Q. And that applies to all the patents?  A. Yes.")).  Because the lump sum only

extended through trial, Comcast is entitled to an ongoing royalty for infringement.[5]  The Court

agrees that Comcast is entitled to an ongoing royalty, and will grant its request for mediation: (1)

directing the parties to conduct a mediation to reach agreement on this royalty, and (2) asking the

---

[5] I say this with some hesitancy, because I do not recall either expert having any analysis that
discounted the lump sum for its coverage of a time period less than the full terms of the patents.

parties to submit the dispute to this Court if mediation fails.  I think any mediation could be postponed until resolution of any appeal of this case.


## III. CONCLUSION

For the foregoing reasons, Sprint's Renewed Motion for Judgment as a Matter of Law and Motion for A New Trial (D.I. 352) is **DENIED**, and Comcast's motion for post-trial relief (D.I. 355) is **GRANTED**.  An appropriate order will follow.